# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-5272-17T2
                A-5275-17T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

M.A.I. and J.H.,

      Defendants-Appellants,

and

K.T.,

      Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF M.A.I.,
M.A.T., J.S.R.B., and M.W.B.,

      Minors.

_____

Submitted October 16, 2019 – Decided December 2, 2019

Before Judges Yannotti and Currier.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0051-18.

Joseph E. Krakora, Public Defender, attorney for appellant M.A.I. (Jennifer L. Gottschalk, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant J.H. (Robyn A. Veasey, Deputy Public Defender, of counsel; Gilbert G. Miller, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Donna Sue Arons, Assistant Attorney General, of counsel; Lisa J. Rusciano, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Margo E.K. Hirsch, Designated Counsel, on the brief).

PER CURIAM

M.A.I. is the mother of four minor children, M.I., M.T., J.B., and M.B., and J.H. is M.I.'s father.[1]  M.A.I. and J.H. appeal from an order of the Family Part dated June 29, 2018, which terminated their parental rights and awarded guardianship of the children to the Division of Child Protection and Permanency

---

[1]  In this opinion, we refer to the parties and others with initials.  To avoid confusion, the minor children's middle initials have been omitted.

(Division). We address both appeals in this opinion. For the reasons that follow, we affirm.

I.

In October 2012, the Division received a report that M.A.I., who was then fifteen years old and thirty-six weeks pregnant, had been admitted to a hospital with high blood pressure. The Division also was informed that M.A.I. had acknowledged using marijuana. Later that month, M.A.I. gave birth to M.I. The child's birth certificate did not identify a father, but M.A.I. reported that J.H. was the father.

In April 2014, M.A.I. gave birth to M.T., but a father was not listed on the birth certificate. Thereafter, the Division received other referrals regarding M.A.I. and the children. On December 9, 2014, the trial court granted the Division's application for care and supervision of the children. The Division thereafter provided the family with services.

In January 2015, the court ordered J.H. to complete a paternity test. He did not comply. In August 2015, the court again ordered J.H. to complete a paternity test, and he again failed to do so. At a hearing conducted in September 2015, J.H. denied paternity of M.I. but refused to be swabbed in court for the paternity test. He also refused to fill out a form to obtain legal representation.

In October 2015, the court found that K.T. was M.T.'s father. In December 2015, the court again ordered J.H. to participate in the paternity test, but he did not comply with the order. In February 2016, the court terminated the protective services litigation because M.A.I. and J.H. had not maintained contact with the Division for six months. That month, M.A.I. gave birth to J.B., and S.B. was identified as J.B.'s father.

In October 2016, after receiving a report that M.A.I. was pregnant and not properly feeding or bathing the children, the Division's investigators contacted M.A.I. and she came to the Division's office with the children. The Division's workers noted that the children had poor hygiene, J.B. had a bad diaper rash, M.I.'s teeth were "yellow and rotten," and M.I.'s clothes were soiled.

M.A.I. reported that she had been living with a cousin, and that she and S.B. had a physical altercation. M.A.I. said she was three months pregnant, and admitted that she smoked marijuana three times a week. She also stated that her cousin had asked her to move out of the apartment. One of the Division's investigators interviewed M.I. and M.T. They reported that they observed the physical altercation between M.A.I. and S.B.

The Division conducted an emergency removal of the children and placed them in resource homes. Thereafter, the court entered an order granting the

Division's application for care, custody, and supervision of the children. In its order, the court noted that M.A.I. did not have stable housing, and that M.A.I. had previously been involved with the Division, but had not completed services. The order also stated that J.H. "has an open case with the Division in which the children have been removed from the home[,]" had two prior felony convictions, and was "currently incarcerated" on charges related to a controlled dangerous substance (CDS).

Thereafter, the Division scheduled supervised visits with the children. She did not, however, attend all of the scheduled visits. Furthermore, the Division referred M.A.I. for substance abuse treatment, domestic violence counseling services, and parenting skills training. The Division also provided family team meetings and bus cards for transportation to services. M.A.I. did not complete these services.

In February 2017, the court held a fact-finding hearing and determined by a preponderance of the evidence that M.A.I. abused or neglected her children. The Division placed M.I. and M.T. with R.T., M.T.'s paternal grandmother. That month, M.A.I. attended a family team meeting and reported that she was living with her sister, but she failed to provide the Division with an address.

In April 2017, M.A.I. gave birth to M.B., and S.B. was listed as the child's father on the birth certificate. The court granted the Division care, custody and supervision of M.B. The Division placed M.B. with R.T. Thereafter, the Division endeavored to assist M.A.I. to find suitable housing, but she did not permit the Division to make the required assessment of her home. She also missed visits with the children and failed to complete services.

In October 2017, the court approved the Division's permanency plan, which had changed from reunification to termination of parental rights and adoption. The court noted that M.A.I. had not complied with services, J.H. was missing and had not planned for M.I., and K.T. was in jail. In addition, paternity tests revealed that S.B. was not J.B. or M.B.'s father, and the court dismissed him from the case.

In November 2017, the Division filed its complaint for guardianship. That month, the Division located J.H. in the county jail, where he was incarcerated as a result of federal charges, and he was served with the complaint. In the months that followed, the Division provided M.A.I. with supervised visits and referred her for services. At the time, M.A.I. was residing with her sister and did not have her own residence. M.A.I. claimed she was employed and provided the Division with a pay stub to substantiate her claim.

6

In January 2018, Dr. Alison Strasser Winston performed a psychological evaluation of M.A.I. Dr. Winston determined that M.A.I. was "currently incapable of providing her children with a safe and stable environment and w[ould] not be able to safely parent her children at any time within the foreseeable future." Dr. Winston recommended that the Division continue to pursue the termination of M.A.I.'s parental rights.

Dr. Winston also recommended that M.A.I. engage in "therapeutically-supervised visitation with her children[,]" "anger management/batterers' intervention counseling[,]" individual psychotherapy, substance abuse treatment, parenting classes, and a GED program. She also recommended that M.A.I. secure appropriate housing. The Division referred M.A.I. for additional services. She attended most of the scheduled visits with the children.

In March 2018, the Division's caseworker met with J.H. in the county jail. She told him the Division's goal was termination of parental rights and adoption. The worker asked J.H. to fill out a form so an attorney could be appointed to represent him in the proceedings. J.H. refused to complete the form and requested a paternity test. He did not request visits with M.I.

In April 2018, J.H. completed his portion of the paternity test, which revealed he is M.I.'s father. M.A.I. completed some services, and continued to

attend visits with the children. She was unable to secure housing and, although she reported that she had a job, she did not know when she would start working.

Dr. Winston conducted an updated psychological evaluation and a bonding evaluation with M.A.I. Dr. Winston found that the children would suffer serious and enduring emotional harm if removed from their resource homes "in order to reunify them with a biological parent who continues to have anger and other mental health issues and lacks stable housing and employment[.]"

Dr. Winston noted that M.A.I. had completed many services, but they were "not sufficient to adequately address her issues[.]" Dr. Winston recommended that M.A.I. participate in more intensive anger management counseling, individual psychotherapy, an updated psychiatric evaluation, and additional parenting classes.

Dr. Winston also opined that M.A.I. "remain[ed] incapable of providing her children with a safe and stable environment." She stated that the children would experience minimal emotional harm if M.A.I.'s parental rights were terminated, and the resource parents could mitigate any such harm. She recommended termination of M.A.I.'s parental rights.

In May 2018, the Division's caseworker met J.H. in the county jail and informed him the paternity test confirmed he was M.I.'s father. She asked J.H. about his plans for M.I. He said that he was focused on his criminal case and did not have a plan for her care. The trial court ordered J.H. to participate in a psychological evaluation, which Dr. Winston could conduct at the jail.

J.H. appeared in court for a pre-trial conference. He did not contest the results of the paternity test, but he refused to participate in a psychological evaluation. The trial court accepted K.T.'s identified surrender of his parental rights to M.T. to his mother, R.T. That month, a federal court sentenced J.H. to thirty-five months in federal prison for the sale or distribution of a CDS and unlawful transportation of a firearm.

In June 2018, the court conducted a trial on the Division's guardianship complaint. The Division presented Dr. Winston and the Division's caseworker as its witnesses. M.A.I. testified on her own behalf. Neither the Law Guardian nor J.H. called any witnesses or presented any evidence. During the guardianship trial, M.I. visited J.H. in jail. Apparently, M.I. thought K.T. was her father and she seemed confused when told J.H. was her father.

The court entered an order dated June 29, 2018, which terminated M.A.I.'s parental rights to her four children and terminated J.H.'s parental rights to M.I.

The order also terminated the parental rights of the unidentified fathers of J.B. and M.B. In an accompanying written opinion, the court found that the Division had established each of the four prongs of the "best interests of the child" test by clear and convincing evidence. These appeals followed.

II.

The scope of our review in an appeal from an order terminating parental rights is limited. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). "Appellate courts must defer to a trial judge's findings of fact if supported by adequate, substantial, and credible evidence in the record." Ibid. (citing In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)).

The Division may initiate a petition to terminate parental rights in the "best interests of the child" and the court may grant the petition if the Division establishes the criteria codified in N.J.S.A. 30:4C-15.1(a) with clear and convincing evidence. N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 166-69 (2010). "The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." Id. at 166

(quoting N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 506-07 (2004)).

Prong one of the best interests test requires the Division to prove that "[t]he child's safety, health, or development has been or will continue to be endangered by the parental relationship[.]" N.J.S.A. 30:4C-15.1(a)(1). This prong focuses on the negative effect the parent-child relationship has upon the child's safety, health, and development. In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). To satisfy prong one, the Division is not required to show that the child was physically harmed, and evidence that the child suffered emotional or psychological harm is sufficient. In re Guardianship of K.L.F., 129 N.J. 32, 43-44 (1992).

The second prong requires the Division to show that "[t]he parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2). In addressing this prong, the court must focus on whether the parent has overcome the harms that endanger the child and whether the parent is able to prevent further harm from the parental relationship. K.H.O., 161 N.J. at 348-49.

11

Prong three of the best interests test requires the Division to establish that it "made reasonable efforts . . . to help the parent correct the circumstances which led to the child's placement outside the home" and considered alternatives to termination of parental rights. N.J.S.A. 30:4C-15.1(a)(3). Prong three "contemplates efforts that focus on reunification of the parent with the child." K.H.O., 161 N.J. at 354. Moreover, the reasonableness of the Division's efforts is not measured by whether its efforts were successful in bringing about reunification of the parent and child. In re Guardianship of DMH, 161 N.J. 365, 393 (1999).

To establish prong four, the Division must present clear and convincing evidence showing that "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). "[T]he fourth prong of the best interests standard cannot require a showing that no harm will befall the child as a result of the severing of biological ties." K.H.O., 161 N.J. at 355.

Instead, the court must balance the relationships of the biological parent and the child, "and determine whether the child will suffer greater harm from terminating the child's ties with" his or her biological parent than from permanent disruption of the child's relationship with a resource parent. N.J. Div.

of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 435 (App. Div. 2001) (citing K.H.O., 161 N.J. at 355).

III.

We turn to M.A.I.'s appeal. She argues that the Division failed to establish prongs one, three, and four of the best interests test.[2] She also argues that the trial court failed to recognize her constitutional right to parent her children.

A. Prong One.

M.A.I. argues that the children never suffered any long-term harm while in her care. She contends any parenting issues were rectified when the children were in foster care. She also claims that while the Division was concerned about her altercation with S.B., the children did not witness the altercation.

M.A.I. further argues that the court erred by focusing on her "homelessness and lack of employment instead of on the health, physical and emotional effects of [her] parenting upon [the] children." She contends this evidence may be considered under prong two, but argues that this evidence has no place in the court's analysis of prong one.

---

[2] Because M.A.I. has not challenged the judge's finding that the Division established prong two, that issue is deemed waived. See Sklodowksy v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2001) (citing Jefferson Loan Co. v. Session, 397 N.J. Super. 520, 525 n.4 (App. Div. 2008)).

We are convinced there is sufficient credible evidence in the record to support the trial court's finding that the children's safety, health, and development were endangered by their relationship with M.A.I. The record shows that the Division removed the children because M.A.I. was pregnant, admitted she regularly smoked marijuana, was homeless, lacked employment, and had recently been involved in a domestic violence incident, which two of the children said they witnessed. During the protective services litigation, M.A.I. failed to complete services and take the actions required so that the children could be returned to her care.

Moreover, while M.A.I. completed some services after the Division filed its guardianship action, Dr. Winston opined that M.A.I. was not able to place what she learned into practice. The doctor explained that M.A.I. required additional services to address her "issues." Moreover, she never secured appropriate housing for herself and the children, and did not maintain employment on a consistent basis. Although the Division had provided M.A.I. with an array of services, she remained unable to provide the children with a safe and secure home, as Dr. Winston testified.

This evidence thus supported the court's finding that the children were harmed by M.A.I.'s relationship with them. See DMH, 161 N.J. at 379 (noting

that "[t]he lack of a permanent, safe, and stable home" can cause harm); <u>Div. of Youth & Family Servs. v. D.H.</u>, 398 N.J. Super. 333, 341-42 (App. Div. 2008) (finding prong one met where parent had mental health issues, failed to comply with the Division's recommendations, was unemployed, and did not have her own housing).

We reject M.A.I.'s contention that the trial court erred by considering evidence of her homelessness and lack of employment in determining whether the Division established prong one. Our Supreme Court has noted that prongs one and two of the test "are related to one another, and evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child." <u>DMH</u>, 161 N.J. at 379 (citing <u>K.H.O.</u>, 161 N.J. at 348-49, 351-52).

B. <u>Prong Three.</u>

M.A.I. argues that the trial court erred by finding that the Division satisfied this prong. She claims the Division did not adequately assist her in finding appropriate housing. She further argues that the court erroneously "found" that she did not "participate meaningfully in any services other than visitation." She asserts that she did, in fact, complete certain services.

As we have explained, the record shows that the Division took steps to assist M.A.I. to find appropriate housing for herself and the children, but she refused to participate in the assessment required for such housing. Thus, the record does not support M.A.I.'s argument that the Division failed to provide her with adequate assistance in securing housing.

There also is no merit to M.A.I.'s contention that the court "found" she "failed to meaningfully participate in any services other than visitation." The record shows that M.A.I. did not complete services during the protective services litigation, despite referrals to substance abuse evaluation, domestic violence counseling, individual therapy, parenting classes, and anger management.

The trial court recognized, however, that M.A.I. had completed certain services during the guardianship proceedings, but as Dr. Winston testified, M.A.I. was not able to place what she learned into practice. She also required additional services. Thus, the record supports the judge's finding that M.A.I. did not "meaningfully participate in any services other than visitation."

We therefore conclude there is sufficient credible evidence in the record to support the court's finding that the Division made "reasonable efforts" to help

16

M.A.I. address the circumstances that led to the removal of the children from her care.

C. Prong Four.

M.A.I. argues that the trial court "placed undue weight on Dr. Winston's opinions about [her] perceived inability to parent her own children." She further argues that Dr. Winston's opinions on her ability to parent were net opinions that the trial court should not have considered. We disagree.

Here, Dr. Winston found the children had an emotional attachment to M.A.I., but it was not a strong and secure attachment. The doctor opined that the children looked to their resource parents as their psychological parents. Dr. Winston also found there would be minimal harm to J.B. and M.B. if M.A.I.'s parental rights are terminated because they were young and their resource parents could mitigate any harm.

Dr. Winston further found that while there may be some harm to M.I. and M.T. if M.A.I.'s parental rights are terminated, their resource parent could mitigate any such harm. As noted, Dr. Winston pointed out that M.A.I. had completed certain services during the guardianship proceedings, but she could not put the skills she learned into practice. Dr. Winston recommended additional services.

We reject M.A.I.'s contention that Dr. Winston's opinions are net opinions. The record shows that the doctor based her findings on her observations of M.A.I. with the children during the bonding evaluations, and on M.A.I.'s psychological evaluation. Because the doctor's opinions had sufficient factual support, they are not net opinions. See Pomerantz Paper v. New Community Corp., 207 N.J. 344, 372 (2011) (noting that net opinion rule requires that an expert opinion be based on "factual evidence").

We are convinced there is sufficient credible evidence in the record to support the trial court's finding that terminating M.A.I.'s parental rights would not do more harm than good. Dr. Winston testified that M.A.I. was not capable of parenting the children and would not be able to do so in the foreseeable future.

The doctor noted that the children had been in resource homes for years and they required permanency. The doctor opined that termination of M.A.I.'s parental rights would not do more harm than good. The trial court found Dr. Winston's testimony to be credible.

Accordingly, the record supports the trial court's finding that the Division established prong four with clear and convincing evidence.

D.  Constitutional Right to Parent.

For the first time on appeal, M.A.I. argues that the trial judge ignored her constitutional right to parent her children.  She contends the judge did not give her any credit for successfully completing services, and the judge failed to recognize her presumptive right to parent her children.  She further argues that the judge "merely rubber-stamped [the Division]'s determination to pursue adoption in lieu of reunification."

"The United States and New Jersey Constitutions protect parents' rights to maintain relationships with their children."  Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014) (citing K.H.O., 161 N.J. at 346).  However, the State retains parens patriae responsibility and thus "may terminate parental rights if the child is at risk of serious physical or emotional harm or when necessary to protect the child's best interests."  Id. at 553-54 (citing N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986)).  As our Supreme Court has recognized, "[t]he best-interests-of-the-child standard codified at N.J.S.A. 30:4C-15.1(a) 'aims to achieve the appropriate balance between parental rights and the State's parens patriae responsibility.'"  Id. at 554 (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007)).

Here, the record shows that the trial court recognized M.A.I.'s fundamental right to parent her children. The court applied the best interests test and required the Division to prove each prong of the test by clear and convincing evidence. As we have determined, the record supports the court's determination that the Division met its burden and established all four prongs of the test.

We therefore conclude that the trial court did not err by terminating M.A.I.'s parental rights to her children.

IV.

We turn to J.H.'s appeal. He argues that the Division failed to establish the four prongs of the best interests test.

A. Prong One.

J.H. contends the Division failed to establish prong one because there was no evidence he physically or sexually abused M.I. or caused her "serious" emotional injury. He contends he could not harm M.I. because he never had custody or control of the child, or any contact with her.

J.H. further argues that the trial court erred by finding his absence from M.I.'s life harmed her because there was "no convincing evidence" the child knew he was her father. He claims he did not know he was M.I.'s father until

20

he was served with the guardianship complaint and his parentage was confirmed in the paternity test.

Here, the trial court found that J.H. has harmed and will continue to harm M.I. in the future. The court noted that J.H. never parented M.I., did not plan for her care, and refused to participate in the litigation until his paternity was established. The court found that J.H. harmed M.I. because he did not provide the child with "the nurture, care or support that the law requires."

We are convinced there is sufficient credible evidence in the record to support the court's findings. It is well established that "the attention and concern of a caring family is 'the most precious of all resources.'" DMH, 161 N.J. at 379 (quoting A.W., 103 N.J. at 613). Furthermore, "[a] parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." Ibid. (citing K.H.O., 161 N.J. at 352-54).

Here, J.H. was informed during the protective services litigation that he may be M.I.'s father. As noted, during those proceedings, the court repeatedly ordered J.H. to participate in the paternity test, but he refused to comply. Thus, J.H. actively avoided his parental responsibilities to M.I., which constitutes a

harm that is sufficient to satisfy the first prong.  See DMH, 161 N.J. at 379 (citing K.H.O., 161 N.J. at 352-54).

Furthermore, after he was served in the guardianship litigation and the paternity test confirmed he was M.I.'s father, J.H. offered no plan for the child, stating that he was focused on his criminal case.  He had one visit with M.I. during the guardianship trial, and during that visit, it appeared that M.I. was confused when told J.H. was her father.  In May 2018, J.H. was sentenced to thirty-five months in federal prison.  While incarcerated, he was not able to provide M.I. with a safe and stable home.

Thus, the record supports the court's finding that J.H. failed to provide the child with "nurture, care or support," thereby harming the child.  We conclude there is sufficient credible evidence in the record to support the Family Part judge's conclusion that the Division established prong one with clear and convincing evidence.

B. Prong Two.

On appeal, J.H. argues the trial court erred by finding the Division established prong two because he was not aware that M.I. was his child until he was served with the guardianship complaint.  He contends he did not have an

adequate amount of time to plan for the child's care.  He further argues that his one visit with M.I. demonstrates he has "a substantial capacity to parent."

J.H. further argues that the trial court erred by relying on his incarceration as a basis for its findings on prong two.  He contends he was not sentenced to a lengthy term of incarceration, he was convicted for non-violent offenses, and the federal district judge recommended he serve his sentence locally.  He therefore argues that he was in a position to foster "a developing relationship" with M.I. through visits in the time remaining on his criminal sentence.  He contends he could build on that relationship when he is released.

We reject J.H.'s contention that the trial court erred by relying on his incarceration as a basis for its finding.  "A parent's lengthy incarceration is a material factor that bears on whether parental rights should be terminated." R.G., 217 N.J. at 555 (quoting In re Adoption of Children by L.A.S., 134 N.J. 127, 143 (1993)).  Incarceration alone is not a sufficient basis for termination of parental rights.  Id. at 556 (citing L.A.S., 134 N.J. at 137-38).

The court may, however, consider the effects a parent's incarceration will have on the child.  Id. at 555-56 (quoting L.A.S., 134 N.J. at 143-44).  These include:  the parent's relationship with the child before the parent was incarcerated, the efforts of the incarcerated parent to remain in contact with the

child, the potential for visitation, and the psychological and emotional effect incarceration has on the child. L.A.S., 134 N.J. at 139.

Here, the trial court properly considered J.H.'s incarceration in its findings on prong two. As we have explained, J.H. has had no relationship with the child since she was born. He met with the child once while he was in jail. In addition, J.H. was sentenced to a thirty-five-month prison term, during which he could not provide the child with a safe and stable home. While J.H. asserts that he could develop a relationship with the child through visits while he is incarcerated and after he is released, the record provides no support for that assertion.

We conclude that the record supports the trial court's finding that the Division established prong two with clear and convincing evidence.

C. Prong Three.

On appeal, J.H. argues the trial court ignored the Division's "egregious negligence" in failing to locate him, serve him with the complaint in the guardianship case, and meet with him and provide him services. He contends the Division's failure to locate him deprived him of the opportunity to participate in the case and from having a parental relationship with M.I. He also contends

that after the Division located him, it failed to provide him with adequate services.

We are convinced, however, that the Division made reasonable efforts to locate J.H. The Division conducted a search for J.H. before it filed its guardianship complaint. It located him in the county jail, and served him with the complaint. As noted, he refused a psychological evaluation, and told the caseworker he was focused on his criminal case and had no plan for the child.

J.H.'s failure to foster a relationship with the child during the protective services litigation was due to his own refusal to participate in the paternity test and confirm his parentage. Moreover, the record supports the trial court's finding that the Division provided J.H. reasonable services. The court noted that the Division had properly focused its efforts on M.A.I., who was the custodial parent when the children were removed.

The court found that J.H. refused to engage in services offered by the Division and refused at times to appear in court. The court concluded that J.H. could not "now claim to have been ignored by the Division." The record supports the court's findings.

J.H. also argues that the trial court violated his Fifth Amendment right against self-incrimination "by drawing a negative inference from his refusal to

submit to the psychological examination demanded by [the Division] while he was facing criminal charges." We disagree.

There is nothing in the record to show that J.H. invoked his Fifth Amendment right when he refused to participate in a psychological evaluation. Furthermore, J.H.'s criminal proceedings were wholly unrelated to the guardianship complaint.

In addition, J.H. pled guilty to the federal charges in January 2018, which was months before he was asked to participate in the psychological exam. He has not explained how he would incriminate himself if he participated in the psychological evaluation. Thus, the trial court did not err by considering J.H.'s refusal to participate in the examination in reaching its decision on prong three.

D. Prong Four.

The trial court found that terminating J.H.'s parental rights to M.I. would not do more harm than good to M.I. The court noted that J.H. had no relationship with M.I., and he never parented her. The court stated that, "Termination of his parental rights cannot do more harm than good in the absence of a parent-child relationship."

On appeal, J.H. argues that his visit with M.I. showed he could potentially form a close parent-child relationship with her. He asserts termination of his

26                                                    A-5272-17T2

parental rights poses a great harm to the child, which he claims outweighs any benefits that could result from the termination of parental rights. Again, we disagree.

There is sufficient credible evidence to support the trial court's findings on prong four. J.H.'s assertion that he could potentially form a close relationship with M.I. is meritless. It is undisputed that J.H. did not have a relationship with M.I. He did not request visitation with the child before his paternity was established, and the record does not support the conclusion that J.H. could develop such a relationship while he is incarcerated. See L.A.S., 134 N.J. at 139 (noting that "once a parent is imprisoned, a relationship with one's children that was nonexistent prior to incarceration will not likely be fostered").

Therefore, the record supports the trial court's determination that termination of J.H.'s parental rights will not do more harm than good. Although Dr. Winston did not evaluate J.H., Dr. Winston opined that M.I.'s resource parent was M.I.'s psychological parent and the child had "a strong and secure emotional attachment to" her. Dr. Winston also stated that the resource parent would be able to provide M.I. with the permanency, stability, security, and trust that she needed. In addition, in her report, Dr. Winston opined that M.I. would

27

suffer "serious and enduring emotional harm" if removed from her resource home.

Thus, the record provides no support for J.H.'s assertion that termination of his parental rights will cause great harm to the child. Rather, the record clearly and convincingly established that termination of J.H.'s parental rights to M.I. would not do more harm than good.

We therefore conclude that the trial court did not err by terminating J.H.'s parental rights to M.I.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

28

A-5272-17T2