# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4701-16T1

NEW JERSEY OF DIVISON
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

W.I.L.

      Defendant-Appellant/
      Cross-Respondent.

_____

IN THE MATTER OF
THE GUARDIANSHIP OF
H.S.A.A.K., a Minor,

      Respondent/Cross-Appellant,

and X.Y.O,

      a Minor.

_____

      Argued telephonically March 23, 2020 –
      Decided May 6, 2020

      Before Judges Ostrer, Vernoia and Susswein.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0196-16.

T. Gary Mitchell argued the cause for appellant/cross-respondent (Joseph E. Krakora, Public Defender, attorney; T. Gary Mitchell, Deputy Public Defender, of counsel and on the briefs).

Cory Hadley Cassar, Designated Counsel, argued the cause for respondent/cross–appellant (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Cory Hadley Cassar, on the brief).

Jane C. Schuster argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jane C. Schuster, Assistant Attorney General, of counsel; Casey Jonathan Woodruff, Deputy Attorney General, on the brief).

Lisa Marie Black, Designated Counsel, argued the cause for minor X.Y.O. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Lisa Marie Black, on the brief).

PER CURIAM

Defendant, W.I.L (Wendy), appeals the termination of her parental rights to her youngest two children, H.K., Jr. (Harry), age fifteen, and X.O. (Xena),

age 12.[1]  The New Jersey Division of Child Protection and Permanency (Division) first became involved with Wendy regarding the care of her older children.  The Division became reacquainted with Wendy when she failed to secure proper medical care for Xena.  The Division also became aware that Wendy kept her home in a deplorable and unsanitary condition and struggled with sending Harry and Xena to school on a regular basis.  Despite the Division's repeated efforts to provide her an array of services, Wendy failed to change her deficient parenting behaviors.

At the time of the guardianship trial, the law guardians for Harry and Xena opposed the termination of Wendy's parental rights and both cross-appealed the trial court's decision.  Shortly before oral argument, we were advised their positions changed since the trial court issued its opinion in June 2017.  Xena's resource parent, we are told, is now committed to adoption.  Her law guardian filed a motion to withdraw her cross appeal and to realign her as a respondent as she now supports the trial court's termination of Wendy's parental rights.

---

[1]  For the reader's convenience and to maintain the confidentiality of records relating to guardianship proceedings, we use pseudonyms to refer to defendant and the two children at issue in this appeal.  R. 1:38-3(d)(12).  We note that four of Wendy's five other children are now adults.  None of her other children are part of this appeal.

Harry's law guardian has also filed a post-judgment motion pursuant to Rules 2:5-5(b) and 4:50-1(b), (e), and (f), based on a change of circumstance. Harry asserts through his law guardian that a former treatment home parent is now willing to become a Kinship Legal Guardian. Harry's law guardian seeks to vacate or stay the judgment of guardianship pending final approval of the former treatment home parent to serve as a Kinship Legal Guardianship caregiver. In doing so, the law guardian hopes to preserve Harry's legal right to have contact with Wendy.

We have reviewed the record in view of the comprehensive briefs submitted by the parties and the applicable legal principles. It is abundantly clear from our review of the voluminous record that Judge David B. Katz rendered a thorough and detailed oral opinion. The court's findings are supported by substantial, credible evidence demonstrating that the Division proved the four prongs of the best-interests-of-the-child test, N.J.S.A. 30:4C-15.1(a), by clear and convincing evidence. In view of the deferential standard of appellate review, we affirm the termination of parental rights substantially for the reasons set forth in the trial court's opinion. We also grant Xena's motion to withdraw her cross appeal. We deny Harry's motion to vacate or stay the judgment terminating Wendy's parental rights.

4

We begin our analysis by acknowledging the legal principles that govern this appeal. A parent has a constitutional right to raise his or her biological child, which "is among the most fundamental of all rights." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 447 (2012) (citing N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 102 (2008)). However, the State as parens patriae may act to protect a child from physical or emotional harm. Ibid. (citing E.P., 196 N.J. at 102). A parent's constitutional rights, in other words, are not absolute and must yield to the State's interest in protecting a child from harm or endangerment. N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599, 600 (1986). Accordingly, the State can seek to sever the parent-child relationship when the interests of the parent and child are irreconcilable. Id. at 599 (citing In re Dep't of Pub. Welfare, 412 N.E.2d 28, 36 (Mass. 1981)). Importantly, a child has a right to a permanent, stable, and safe placement. N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004).

The termination of parental rights should only be pursued when "proof of parental unfitness is clear." F.M., 211 N.J. at 447. In a termination proceeding, the trial court determines whether the Division has satisfied the four elements

of the best-interests-of-the-child statutory test.  N.J.S.A. 30:4C-15.1(a).  That

statute requires the Division prove by clear and convincing evidence that:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [Ibid.]

When applying the best interests test, a trial court must pay specific

attention to a child's need for permanency and stability.  In re Guardianship of

D.M.H., 161 N.J. 365, 385–86 (1999).  As a result, the trial court must consider

"not only whether the parent is fit, but also whether he or she can become fit

within time to assume the parental role necessary to meet the child's needs."

N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 87 (App. Div. 2006) (citing In re Guardianship of J.C., 129 N.J. 1, 10 (1992)).

The scope of our review of the decision to terminate parental rights is limited. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). "Appellate courts must defer to a trial judge's findings of fact if supported by adequate, substantial, and credible evidence in the record." Ibid. (citing In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)). An appellate court should defer to the trial court's credibility determinations and to its "special expertise in the field of domestic relations." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). An appellate court therefore should not alter the findings below unless there was a manifest denial of justice. N.J. Div. of Youth & Family Servs. v. V.K., 236 N.J. Super. 243, 255 (App. Div. 1989) (citing Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 475 (1988)). However, appellate courts review de novo the trial court's interpretation of the law and legal findings. R.G., 217 N.J. at 552 (citing Manalapan Realty v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995)).

## II.

The guardianship trial was conducted over five non-consecutive days starting in March 2017 and ending in May 2017. Wendy did not call any witnesses. Nor did either law guardian. The judgment terminating Wendy's parental rights was issued on June 19, 2017.

The pertinent facts adduced by the Division at the guardianship trial are set forth comprehensively in the trial court's oral opinion. We presume the parties are familiar with that opinion. Accordingly, we highlight in this opinion only those facts we deem to be particularly relevant. In short, Wendy, who suffers from cognitive and mental health issues, has demonstrated over the course of many years that she is incapable of maintaining a clean and healthy home and making certain the children attend school. She sporadically and unsuccessfully attended multiple programs to address her shortcomings. She also repeatedly failed to appear at visitation. The children have not lived with her since 2014 and the Division's uncontroverted expert testimony shows that Wendy is both unwilling and unable to address the issues that resulted in the removal of the children.

A-4701-16T1

## A.

Under the first prong of the best-interests-of-the-child test, the trial court examines the effect of the harm that stems from the parent-child relationship over time. N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 506 (2004). It may consider both physical and psychological harm and, therefore, may base its termination decision on emotional injury in the absence of physical harm. See In re Guardianship of R., 155 N.J. Super. 186, 194 (App. Div. 1977) ("The absence of physical abuse or neglect is not conclusive on the issue of custody.").

We conclude the Division presented adequate, substantial, credible evidence to support the trial court's conclusion that Wendy endangered and would continue to endanger Harry's and Xena's safety, health, and development. We note that the termination of parental rights need not wait until a child is actually harmed by a parent's inattention or neglect. D.M.H., 161 N.J. at 383 (citing A.W., 103 N.J. at 616 n.14). Parental rights, in other words, can be terminated in the absence of physical harm. See ibid. (citing A.W., 103 N.J. at 616 n.14). It also is well settled that termination of parental rights can occur based upon the risk of future harm that a child may experience as a result of the parental relationship. See N.J. Div. of Youth & Family Servs. v. H.R., 431 N.J. Super. 212, 223 (App. Div. 2013) (stating "[w]hen the condition or behavior of

a parent causes a risk of harm . . . the first subpart of the statute has been proven").

In this instance, the trial court assessed all of Wendy's parenting deficiencies that have manifested over the years. The court did not need to isolate a single, damaging harm but rather properly considered the cumulative effect of multiple harms occurring over time. The New Jersey Supreme Court has stated in this regard that "[a]lthough a particularly egregious single harm can trigger the standard, the focus is on the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348. Here, the combined problems of medical neglect, educational neglect, an unsanitary home, and inconsistent attendance at visitation all contributed to the harm experienced by Harry and Xena.

B.

The second prong of the best interests test requires that the Division demonstrate that the "parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2).

Under the second prong of the best interest analysis, which is closely related to the first prong, parental unfitness can be demonstrated in two alternative ways. K.H.O., 161 N.J. at 352. First, a party can show that it is reasonably foreseeable that the parents will not or cannot cease to inflict harm upon the child. A.W., 103 N.J. at 606–07, 615–16. This can be established by proving parental "dereliction and irresponsibility," which can be shown by proof of continued substance abuse, the inability to provide a stable home, and the withholding of nurturing and attention. K.H.O., 161 N.J. at 353.

The other way of establishing the second prong is by presenting evidence that removing the child from his or her resource placement would cause serious and enduring mental or emotional impairment. N.J.S.A. 30:4C-15.1(a)(2). Under this alternative approach, a trial court examines the bonds between a child and his or her resource parent(s). See D.M.H., 161 N.J. at 382 (finding the second prong from N.J.S.A. 30:4C-15.1(a) established partly based upon the court-appointed expert's determination that "breaking the children's bond with their foster family would cause substantial and enduring harm to the children").

Wendy contends the trial court viewed visitation reports selectively to cast her in a negative light. We disagree. The record amply supports the court's conclusion that Wendy failed to consistently attend her visitation. When

11

provided by the Division with the opportunity for visitation, she was chronically late or did not attend at all. Subsequently, she was referred to Tri-City for visitation, but she was ultimately terminated from that service because she regularly failed to attend or was late. Tri-City noted that the children displayed behavioral problems in connection with Wendy's missed visitation. After Tri-City, Wendy was referred to Adoption House for visitation and was ultimately terminated from that service due to her failure to attend. Finally, when the Division offered Wendy a visitation at the Division offices in January 2017, Wendy declined even though she knew that the children wanted to see her.

In these circumstances, the trial court did not err when it held that the second prong was satisfied. As we have noted, indications of parental dereliction and irresponsibility can demonstrate parental unfitness. K.H.O., 161 N.J. at 353. Wendy was afforded with a period of years to comply with services or make progress in improving her parenting. The record is replete with evidence that Wendy was unwilling or unable to do so.

We add that the trial court relied on the testimony of a qualified expert who evaluated the children's relationships with the parent and alternative caregivers. See J.C., 129 N.J. at 19 (explaining that the Division's proofs in termination proceedings "should include the testimony of a well-qualified expert

who has had a full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with the foster parent").  A court is permitted to rely upon competent expert testimony to determine the possibility that harm could occur if the family was reunified and whether harm would befall the children.  Ibid.

In sum, the trial court relied on clear and convincing evidence in the record when it concluded that Wendy was unwilling or unable to eliminate the harm facing Harry and Xena and was unwilling and unable to provide a safe and stable home.

C.

The third prong of the best interest test requires the Division to show that it made "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside of the home and the court has considered alternatives to the termination of parental rights."  N.J.S.A. 30:4C-15.1(a)(3).  As a result, the trial court must decide if the Division made reasonable efforts to reunify the family.  In re Guardianship of K.H.O., 161 N.J. at 354 (citing N.J.S.A. 30:4C-15.1(a)(3)).  Pursuant to statute, "reasonable efforts" are defined as:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;

13

(2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;

(3) informing the parent at appropriate intervals of the child's progress, development, and health; and

(4) facilitating appropriate visitation.

[N.J.S.A. 30:4C-15.1(c).]

We have previously recognized that reasonable efforts "vary depending upon the circumstances of the removal." N.J. Div. of Youth & Family Servs. v. F.H., 389 N.J. Super. 576, 620 (App. Div. 2007) (citing N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 437 (App. Div. 2007)). The Division's success regarding this prong is not measured by the parent's participation in the necessary services. D.M.H., 161 N.J. at 393. "[E]ven [the Division's] best efforts may not be sufficient to salvage a parental relationship." F.M., 211 N.J. at 452. Pursuant to statute, the Division must: (1) work with parents to develop a plan for services; (2) provide the necessary services; (3) facilitate visitation; and (4) notify parents of the children's progress during an out-of-home placement. N.J.S.A. 30:4C-15.1(c).

Wendy contends that the Division did not provide services to her that were tailored to her income, needs, educational level, and language barrier. We reject

14

that contention. There was ample evidence in the record to support the court's conclusion that the Division made reasonable efforts to reunify Wendy with Harry and Xena.

The court heard testimony, for example, that the Division provided services to Wendy and her family over a period of years that included furniture and rental assistance aimed at correcting her housing issues while taking into account her financial needs. She was provided transportation in the form of bus passes to assist her with seeing the children after removal. She was afforded numerous psychological and neuropsychological evaluations aimed at identifying her specific needs. She also received referrals for individual psychotherapy. In addition, the Division provided services tailored to Wendy's need for parenting assistance, such as referrals to Family Preservation Services (FPS), a parent aide, and parenting classes.

Regrettably, Wendy did not take advantage of these services. As we have already noted, she was inconsistent with her visitation. She also was terminated from FPS on two occasions and was not an active participant in the other services offered to her. While she did complete a parenting skills course, she did not learn from that opportunity as evidenced by her ongoing and un-

15

remediated parenting difficulties. Furthermore, there is no indication in the record that Wendy requested any services that were denied by the Division.

The record also reflects that the trial court considered alternatives to the termination of parental rights. The Division assessed numerous relatives and ruled them out. While Wendy contends on appeal that the Division did not consider another individual, S.G., the record reflects that the court accepted additional testimony that the Division ruled out S.G. due to S.G.'s failure to comply with an interstate home assessment. The only half-sibling that was not assessed at the time of the guardianship trial was A.A. because he was a minor at the time.

In sum, there was clear and convincing evidence in the record to support the court's conclusion that the Division made reasonable efforts aimed at reunification and that no viable alternatives to the termination of Wendy's parental rights existed.

## D.

The fourth prong of the best interests test requires that the Division demonstrate that "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). The court may rely on expert testimony when conducting its analysis and may balance the potential injury that a child

16

could experience through the termination of parental rights against the harm that the child might suffer if removed from the resource placement. K.H.O., 161 N.J. at 355, 363. Termination of parental rights is necessary when it permits a child to have a secure and permanent home. N.J. Div. of Youth & Family Servs. v. B.G.S., 291 N.J. Super. 582, 592–95 (App. Div. 1996). Relatedly, a child should not "languish indefinitely" in an out-of-home placement while a parent tries to correct his or her parenting difficulties. N.J. Div. of Youth & Family Servs. v. S.F., 392 N.J. Super. 201, 209 (App. Div. 2007) (citing N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004)).

The Division presented expert testimony to establish this prong. Based on his observations, Dr. DeNigris testified that Wendy had significant poor judgment that would endanger the health, safety, and development of her children. He opined that she lacked the ability to be a safe and appropriate caretaker. Moreover, Wendy refused to take responsibility for her actions, opting instead to blame others, which led Dr. DeNigris to forecast that she would continue to repeat her prior problematic behaviors. Additionally, Wendy's insistence that she already knew everything about parenting coupled with her belief that the children did not suffer from behavioral problems would, according to the expert, result in Wendy's continued neglect of the children in

the event of reunification. Her refusal to participate in services further indicated that she was not committed to reunification.

We conclude the trial court acted within its broad discretion when it accredited the expert testimony that Wendy was not capable of parenting and would not become capable for the foreseeable future. Wendy nonetheless contends that the termination of her rights will do more harm than good. She argues, for example, that Harry and Xena are bonded with her and that both children want to be reunified with their mother.

We reject Wendy's argument because the trial court properly accounted for the expert testimony concerning bonding. The record shows in this regard that Dr. DeNigris performed a bonding evaluation among Wendy, Harry, and Xena. He testified that while Harry and Xena were affectionate with their mother, she did little to initiate the contact. What is more, Dr. DeNigris observed that Harry repeatedly tried to get Wendy's attention, but she was unresponsive. Both children informed Dr. DeNigris that they wanted to be reunified with Wendy. Although the expert thus concluded that there was a bond among Wendy, Harry, and Xena, he also explained that aspects of the evaluation caused him concern. He opined that Harry's and Xena's need for a stable environment outweighed any harm the children could experience if Wendy's

18

parental rights were terminated. We believe the trial court acted well within its ambit of discretion in accepting the expert's uncontroverted opinion.

Wendy contends that the present case is analogous to E.P. There, the Court held that the Division failed to prove by clear and convincing evidence that the termination of a mother's rights would not do more harm than good because the mother and the daughter shared a strong bond and loving relationship, the mother was mostly compliant with services, and the daughter had no prospects for adoption. E.P., 196 N.J. at 94–98, 110.

The situation presented in E.P. is markedly different from the present case. Here, Wendy was not mostly compliant with her services and Xena has not moved between multiple resource homes. Rather, Wendy has been resistant to treatment and Xena has been in the same placement since November 2014. What is more, Wendy did not present any expert testimony to counter the Division's expert testimony that Harry and Xena would be harmed if reunification were to occur.

Wendy also argues that the trial court did not take into account the children's wishes. That argument is contradicted by the record. The trial court interviewed both Harry and Xena in-camera regarding their feelings about visitation and, also, the court was aware that Xena wanted reunification with

19

Wendy. The trial court stated on this point, "I'm very aware of the child's – of the children's wishes. And I have considered them as well."

Finally, we note that Wendy contends the trial court improperly shifted the burden of proof to her rather than on the Division. That contention also is belied by the record. The trial judge specifically remarked:

> And looking at this from another perspective as well, [Wendy] has had enough time to demonstrate and convince the [c]ourt that she can parent.
>
> Now, she has no burden of proof here. I'm not putting a burden of proof on her. But the Division has demonstrated that it has shown the [c]ourt that the children are at risk if returned to their mother, and it's not likely changing in the foreseeable future

In sum, we believe there was clear and convincing evidence in the very substantial record developed in this case to support the trial court's conclusion that the termination of Wendy's parental rights would not do more harm than good. Considering all of the evidence presented by the Division relevant to the fourth prong, including the uncontroverted expert testimony, it cannot be said that the trial court's conclusion with respect to the fourth prong "'went so wide of the mark that a mistake must have been made.'" N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting C.B. Snyder Realty, Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)).

## III.

We conclude that the voluminous record amply supports the trial court's determination that the Division established all four prongs of the best interest test by clear and convincing evidence. To the extent we have not already addressed them, any additional arguments made by Wendy and the law guardian for Harry lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E).

Finally, we address Harry's post-judgment motion seeking a stay or remand based on recent developments with respect to the prospect that a former treatment home parent will become his Kinship Legal Guardianship (KLG) caregiver.[2] The law guardian argues that the probability of Harry's eventual KLG placement undermines the trial court's finding under the third prong that alternatives to termination of Wendy's parental rights were considered exhaustively. In seeking this relief, he hopes to preserve Harry's ability to maintain contact with his mother notwithstanding her repeated and persistent

---

[2] The Division's March 19, 2020, letter states,"[Harry] has been in a treatment-level home. A former treatment home parent who had [Harry] with him is now committed to becoming a Kinship Legal Guardianship caregiver for [Harry]. The Division's plan is to move [Harry] into that caregiver's home in the immediate future." We have since been advised by his law guardian that Harry has been moved into that caregiver's home.

21

failures with respect to visitation and the emotional harm those failures caused.[3]

His law guardian contends that, "[a]bsent the relief requested, [Wendy's] parental rights could be terminated leaving [Harry] with no legal right to ongoing contact with his mother pending the protracted KLG process that would likely take over a year." See N.J.S.A. 3B:12A-2 to 4.

We recognize that the KLG permanency option preserves certain parental rights such as parental contact. See N.J. Div. of Youth & Family Servs. v. D.H., 398 N.J. Super. 333, 340 (App. Div. 2008) (citing N.J.S.A. 3B:12A-1(b)). In the circumstances of this case, however, we believe further delay occasioned by a remand would be inappropriate. This case has been in litigation for ten years. Harry and Xena were removed from their mother in 2014 and this appeal has been pending since July 2017. Both children deserve stability and permanency. See J.N.H., 172 N.J. at 474–75 ("Where the future of a child is at stake, there is an additional weight in the balance: the notion that stability and permanency for the child are paramount." (citing K.H.O., 161 N.J. at 357–58)); see also In re Guardianship of P.S., 315 N.J. Super. 91, 116 (App. Div. 1998) (recognizing the goal of permanency in placement is paramount for children).

---

[3] As we have noted, one of the State's experts testified that when Wendy did attend visitations, Harry repeatedly tried to get her attention, but she was unresponsive to him.

In these circumstances, we do not believe Harry has demonstrated the need to set aside the judgment of guardianship. As we have noted, the Division is in the process of assessing a former caregiver for KLG status. See supra note 2. As the Division notes in its opposition to Harry's motion, the potential KLG caregiver is not yet licensed, and Harry's recent placement in that home is on a presumptive basis pending full licensure of the home. Indeed, Harry's law guardian acknowledges that this vetting process may take a year or more. Given the advanced state of this litigation and the lengthy timeline for vetting the prospective KLG caregiver, we affirm the trial court's ruling that termination of defendant's parental rights is in Harry's best interests at this time.

We are cognizant that the eventual grant of KLG caregiver status would require the judge to vacate the termination of defendant's parental rights pursuant to a motion by defendant under Rule 4:50-1. We do not foreclose that possibility and take no position on whether it would be in Harry's best interests to approve the KLG caregiver and vacate the termination of defendant's parental rights. We leave that determination to the judge who reviews the KLG vetting process. We note that should the judge decide to vacate the termination of defendant's parental rights and grant KLG caregiver status, defendant would

acquire only the rights afforded under the KLG statute.  <u>See</u> N.J.S.A. 3B:12A-6(e).

In sum, we conclude that Harry has not established that extreme and unexpected hardship will occur unless the judgment of permanency is stayed pending a remand.  <u>J.N.H.</u>, 172 N.J. at 473 (citing <u>Little</u>, 135 N.J. at 286). Because further delay is unwarranted, and because the specific relief Harry ultimately seeks remains available at the trial level, we deny the motion filed on Harry's behalf for a stay or remand.  We do, however, grant the motion filed on behalf of Xena to withdraw her cross appeal and realign her as a respondent.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4701-16T1