# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2931-21

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

K.W.,

     Defendant-Appellant,

and

R.G.,

     Defendant.

_____

IN THE KINSHIP MATTER OF
Z.G., a Minor.

_____

Submitted December 11, 2023 – Decided January 4, 2024

Before Judges Sabatino and Marczyk.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Somerset County, Docket No. FL-18-0103-22.

Joseph E. Krakora, Public Defender, attorney for appellant K.W. (Victor E. Ramos, Assistant Deputy Public Defender, of counsel and on the briefs; Richard A. Foster, Deputy Public Defender, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent New Jersey Division of Child Protection and Permanency (Melissa H. Raksa, Assistant Attorney General, of counsel; Meaghan M. Goulding, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor Z.G. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; David Ben Valentin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

K.W. ("Kim"), the biological mother[1] of Z.G. ("Zaid"), appeals from the May 9, 2022 Family Part judgment awarding C.G. ("Carol") and P.G. ("Paul") Kinship Legal Guardianship ("KLG") of Zaid.[2] The court entered KLG in favor

---

[1] R.G. ("Rob"), Zaid's biological father, consented to the entry of a KLG with Zaid's current resource parents, Carol and Paul. He is not a party to this appeal.

[2] We refer to the parties, the child involved in this case, and defendant's other children using either initials or pseudonyms to protect their privacy and the confidentiality of these proceedings. R. 1:38-3(d)(12).

of Carol and Paul over Kim's sister, A.C. ("Ava"), and her husband, D.C. ("Dylan"). Following our review of the record and the applicable legal principles, we affirm.

On appeal, Kim only challenges the judge's findings on prong four under N.J.S.A. 3B:12A-6(d). A central theme of Kim's arguments is that Ava and Dylan are allegedly more capable of addressing intangible racial and cultural issues essential to Zaid's upbringing.[3]

## I.

Because we write primarily for the parties, who are familiar with the extensive record in this case, we primarily address the underlying facts and procedural history most relevant to the KLG ruling and only summarize the facts concerning the history leading to Zaid's ultimate removal from Kim.

Zaid is currently seventeen years old and will turn eighteen in December 2024. Zaid has been involved with the Division of Child Protection and Permanency ("Division") since he was two years old, with his first removal from Kim taking place at the age of six. Since then, he has been in and out of placement. Over the years, the Division made several attempts to reunify Zaid

---

[3] Kim, Zaid, Ava, and Dylan are Black. Carol, Paul, and their children are White.

with Kim. Those efforts were unsuccessful due to Kim's serious alcohol and mental health issues, repeated encounters with law enforcement, and neglectful care of Zaid.[4]

Between 2013 and 2016, Zaid resided in four different foster homes until he was placed with his maternal grandmother, Y.H. ("Yanni"), in August 2014.[5] By August 2015, when Zaid was eight years old, Yanni was no longer able to care for Zaid and requested the Division assess Zaid's maternal aunt, Ava, who at the time resided in Virginia with Dylan. In October 2015, Ava expressed interest in being a long-term option for Zaid if there were no other options available. However, in November 2015, she withdrew herself as a placement option.

---

[4] None of the experts at the KLG trial opined that Kim should be reunified with Zaid.

[5] On the following occasions, Zaid was removed from Kim's care and was placed in other homes: March 1, 2013 through August 23, 2016 (in four non-related licensed resource homes and one placement with Yanni for two years beginning August 1, 2014); March 30, 2017 through February 12, 2018 (in a non-related licensed resource home); September 5, 2018 to present (returned to a previous unrelated resource home then placed with Carol and Paul on November 8, 2018).

A-2931-21

After complying temporarily with treatment services, Kim reunified with Zaid in August 2016. Between 2016 and 2018, there were a series of removals and reunifications culminating with the final removal in August 2018.[6]

In October 2018, Carol and Paul agreed to become licensed resource parents to provide Zaid with a stable home. In November 2018, the Division placed Zaid in the home of Paul and Carol and their children, J.G. ("Jack") and S.G. ("Sara"), where Zaid has continued to reside. Paul had been Zaid's football coach. Zaid and Jack were friends before Zaid was placed in the home. Paul is an institutional consultant for an asset management firm, and Carol is an attorney. Carol and Paul reside in a suburb close to Kim's residence.

In November 2018, Ava, who was then residing in England and earlier learned of Zaid's removal, expressed interest in caring for him. However, Ava later advised the Division she was not able at that time to have Zaid placed with her. Consequently, the Division ruled Ava and Dylan out as a potential placement.

---

[6] On August 31, 2018, when Zaid was eleven years old, the Division received the most recent referral that Kim was arrested for allegedly driving while intoxicated with Zaid in the back seat. Zaid had called his friend from the vehicle because he was scared, and his friend called the police. Kim ultimately pled guilty to second-degree endangering the welfare of a child. She was sentenced to five years of special probation in Recovery Court.

In December 2018, the Division filed for guardianship of Zaid under FG-18-106-19. During the subsequent trial in 2019, Kim's expert, Dr. Susan Cohen Esquilin, testified concerning racial and cultural issues involving Zaid. She noted he had not embraced his racial identity and concluded that any permanency plan deemed appropriate by the court must consider Zaid's need to continue a relationship with his biological family because it is necessary for his "positive racial identity development, in the long run." Additionally, Dr. Esquilin recommended Zaid be exposed to Black male role models and suggested group therapy. She also recommended that Carol and Paul consult a therapist familiar with racial identity issues.

In October 2019, following the trial, the court concluded the Division failed to establish clear and convincing evidence that termination of Kim's parental rights to Zaid was appropriate. While the court found the Division had proven prongs one and two, it failed to prove the third and fourth prong because the Division had not sufficiently presented alternative permanency options to Ava, and Zaid remained bonded to Kim and would experience harm if her rights were terminated. The court further found Kim had not demonstrated that Zaid should be reunified with her, dismissed the guardianship litigation, and reinstated the protective services litigation.

A-2931-21

Thereafter, the Division continued to provide Kim with services, including visitation, transportation, and assistance to address her mental health issues and alcohol abuse, but the efforts were not successful.[7] In February 2020, the Division again proposed termination of parental rights followed by adoption with a concurrent plan of KLG because of the length of time Zaid had been in placement.

At a permanency hearing in February 2022, the court approved the Division's permanency plan of KLG with Carol and Paul or with Ava and Dylan.[8] In March 2022, the Division amended its complaint to pursue KLG.

---

[7] To address Kim's and Dr. Esquilin's concerns over Zaid's racial and cultural identity issues, the Division arranged for a Black mentor—who had himself been placed with White resource caregivers—to meet with Zaid. Zaid and the mentor spoke on the phone once and then, according to the Division caseworker, it "fell apart with the pandemic." Another solution to address racial concerns was for Carol and Paul to foster a relationship between Zaid and Paul's cousin's spouse who could mentor Zaid. Another possible option to address racial issues was for Zaid to receive therapy with a Black therapist. Zaid showed modest interest in attending therapy, and the therapist did not respond to the Division's inquiries, and Zaid remained on the waitlist. The Division attempted to explore other therapists, but Zaid did not want to engage in counseling. Additionally, the Division facilitated contact between Carol and Paul with other resource parents who had adopted a Black child.

[8] By 2019, Ava and her family had relocated to Texas, and she offered herself as a placement resource for Zaid. The Division initiated an Interstate Compact on the Placement of Children (ICPC) request and arranged for Zaid to visit in February 2020, while the ICPC request was pending. Ava's home was approved

A-2931-21

Kim sought, as an alternative to reunification, that KLG of Zaid be awarded to her sister, Ava. Ava is a military veteran who retired from twenty-four years of service in the Air Force in late 2019 after an assignment in the United Kingdom. Dylan is also in the military.

The trial court interviewed Zaid in camera on August 31, 2020, and again on March 11, 2022. Zaid maintained his desire to remain with Carol and Paul and opposed moving to Texas. Zaid referred to Jack and Sara as his siblings. He described Ava as "nice" but reported that he really did not know her or her family and did not keep in touch with them. Zaid did not want additional visits with Ava and repeatedly and unequivocally stated he did not want to move to Texas with her. Zaid described how when he needed a place to go, Ava was not there for him and now is available only because it is "convenient" for her.

The KLG trial was subsequently conducted over twelve days between March and May 2022. Dr. Kinya Swanson, an expert in psychology, parental fitness, best interest, and permanency, testified on behalf of the Division. She

---

in June 2020. Zaid occasionally visited Ava. After a 2021 visit, Zaid expressed that he enjoyed the visit and would like to visit again but did not want to live there. Because of subsequent COVID-19 restrictions and Zaid's overall lack of interest in visiting, the Division did not schedule another visit in Texas. At Zaid's request, the Division offered to facilitate and pay for a visit in New Jersey. Ava declined.

A-2931-21

conducted a psychological evaluation of Kim, comparative bonding evaluations in 2020, and an updated best-interest evaluation in 2021. In October 2020, Dr. Swanson conducted a bonding evaluation between Zaid and the resource family members. She interviewed Zaid, who expressed he did not want to be reunified with Kim but wanted to remain with Carol and Paul. He was, however, agreeable to ongoing visitations with Kim. Dr. Swanson observed that Zaid appeared integrated into Carol and Paul's family. Carol and Paul were involved with each child's education and extracurricular activities. Dr. Swanson described the household as a "cohesive family unit" and concluded Zaid had established a secure bond with them. She also concluded that if Zaid were removed from Carol and Paul's home, he would be at risk of severe and enduring harm.[9] She recommended the Division explore KLG with Carol and Paul.

Dr. Swanson conducted updated interviews with Carol, Paul, Zaid, Jack, and Sara in June 2021. Carol and Paul remained committed to adopting Zaid. Carol and Paul also expressed that they would not place any barriers in the way

---

[9] Dr. Swanson concluded that Kim was not a viable parenting option because of her psychological functioning and ongoing concerns over her sobriety. She concluded that Zaid and Kim shared a significant bond after conducting a bonding evaluation. Because Zaid and Kim shared a significant bond, Dr. Swanson did not support termination of her parental rights.

A-2931-21

of Kim and Zaid's ongoing visitation. Dr. Swanson described Zaid as "fully integrated" into the family.

Dr. Swanson spoke with Zaid in June and September 2021. Both times, Zaid clearly expressed that he wanted to be adopted by Carol and Paul. Zaid remained opposed to relocating to Texas, even after returning from his visit there in July 2021.

Regarding cultural issues, Dr. Swanson acknowledged that Carol and Paul could foster additional Black role models for Zaid, but noted they were open and willing to discuss race and appeared willing to seek resources for Zaid. She also noted there were steps they could take to ensure Zaid had appropriate role models to provide him cultural insights he would need to know. While they had some discussions about race, specifically regarding George Floyd, they had not included the whole family in the conversations. Dr. Swanson stated she did not perceive any barriers for Carol and Paul in continuing to engage in these conversations. Dr. Swanson agreed the resource parents were willing to promote cultural awareness and teach Zaid about personal safety, with the help of Paul's cousin's spouse, who is of African ancestry. She confirmed that Paul considered his cousin's spouse to be someone to whom he turned to talk to Zaid about issues

A-2931-21

such as his experience about being stopped by police multiple times in his own neighborhood.

Dr. Swanson also spoke with Ava in August 2021, but Dylan was at work and did not respond to attempts to interview him. Dr. Swanson testified that Ava presented as a suitable and appropriate caregiver and added that aside from Zaid's preference not to relocate, she did not discern anything else to detract from that opinion. She indicated she did not have any reason to believe if Zaid were ordered to relocate to Texas that he could not flourish there. Dr. Swanson also opined, regarding relocation, that Ava's family support system, their understanding of Zaid's emotional and cultural needs, and their commitment to ensuring he receives needed services would help mitigate any potential harm resulting from relocating from his caregivers' family.

However, Dr. Swanson indicated that "undue distress" could result from relocating him because he was fully integrated with his caregivers and wanted to remain there. She added that Zaid was content at school with his football team and had developed sibling relationships with Jack and Sara.

Ultimately, when balancing both placements, Dr. Swanson testified:

> I think in this case it's important to note that on the surface of things you're really deciding between two capable families that are both suitable with regard to best interests. I think what the actual issue is here is

11

[Zaid]'s history. Because [Zaid] has had so many placements, he's had so much instability in his young life I think, again, it's better for him to stay with [Carol and Paul's] family despite the cultural difference. I think that's what makes a difference if this case, if it was just about who could raise him and teach him how to be a [B]lack man [then], of course, his maternal relatives would be the best placement, but I think this case is about more than that.

Ultimately, because of Zaid's need for permanency and stability, Dr. Swanson supported KLG with Carol and Paul.

Dr. Karen Wells testified on behalf of the Law Guardian as an expert in psychology, parental fitness, bonding, and psychopathologies. She testified on March 17, 2022.[10] Dr. Wells noted that Ava and Dylan expressed a desire for Zaid to live with them and be part of their family. They wanted him to "grow up to be a responsible human being." They recognized they would likely need some expert help but were open to getting him whatever help he needed.

Dr. Wells indicated that despite having relocated in the past due to their military careers, Ava was set on remaining in Texas. Dr. Wells indicated that Ava is committed to Zaid long term and showed no reluctance to assume his

---

[10] Dr. Wells diagnosed Kim with an alcohol use disorder, bipolar disorder, and possible borderline personality disorder. Because of Kim's ongoing mental health instability, ongoing alcohol abuse, and ongoing denial of such problems, Dr. Wells did not find reunification a viable option now or in foreseeable future.

care. Dr. Wells testified that Ava and Dylan were on the "same page," and she had no concern with their ability to provide Zaid with stability. Regarding race and culture, Dr. Wells indicated that Dylan, a long-term career military person and father, would be a positive Black role model.

Dr. Wells also noted Zaid wanted to reside with Carol and Paul and be adopted by them because their home was safe and stable. She further testified that Zaid wanted to remain in contact and have visitation with Kim, but he did not trust her for day-to-day care. Dr. Wells addressed her November 5, 2020 bonding evaluations of Zaid with the resource family where she described their interactions as very natural, spontaneous, and akin to a family dynamic between parents and children.[11]

Dr. Wells confirmed that she reviewed evaluations prepared by the defense psychologist, Dr. Esquilin, from the prior guardianship trial. She agreed Ava and Dylan could teach Zaid about family traditions, expose him to cultural and ethnic matters, and educate him regarding racial issues. She also noted they could provide a stable home. However, that would require Zaid to leave his

---

[11] Dr. Wells opined that adoption was in Zaid's best interest—contrary to others recommending KLG—because she had "come to believe [it] is the only safe option for him for stability, permanency, security and protection."

A-2931-21

current resource family, with whom he has lived for over three years, and cut off his involvement with sports teams, friends, routines, and the place he calls home. She noted:

> Finally settled after a host of placements and multiple reunifications and removals from his mother, [Zaid] is yet once again being confronted with the idea that he will leave his home and be placed elsewhere. And yes, while it is not dismissed that this home is not "family," for [Zaid], [Carol and Paul] have become family.

Dr. Wells further concluded that although race and biology are important in child welfare cases, the child's stability, permanency, and feeling of being protected are also factors that required consideration. Dr. Wells also considered it critical that Zaid's wishes be considered, given his unstable childhood and his desire for stability and certainty with his caregivers.

Dr. Esquilin, who testified on behalf of Kim as an expert in parental fitness, bonding, permanency, child abuse and trauma, and child and general psychology, recommended in May 2019 that Zaid be exposed to adult Black role models, as she considered exposure to various people from that community and development of relationships important. She made the recommendation because Zaid lacked historical or cultural self-awareness.

For purposes of the KLG trial, Dr. Esquilin prepared an updated report on February 18, 2022, which addressed recommendations she made in a set of

14

psychological and bonding evaluations from April 2019, that had been submitted for the prior guardianship trial. Dr. Esquilin had not conducted any updated evaluations or interviews since her evaluations in 2019, and the report was based on Drs. Wells' and Swanson's reports and six contact sheets. After reviewing the material, Dr. Esquilin testified that Carol and Paul still had not fully engaged Zaid and the family in conversations about race nor had they consistently exposed him to his race and culture.

Dr. Esquilin noted there was some attempt to address her 2019 recommendations regarding race and culture, though they had not been fully addressed. She considered it unlikely that Paul's cousin's spouse would have the same set of experiences of Blacks and added that it was also "virtually impossible" for any one person to give a child the full cultural experience.[12] She indicated that beyond responding to the George Floyd incident, there was no exposure to cultural events or consultation with the sort of therapist she had recommended.

Regarding the reasons it was important for Zaid to develop his racial identity, Dr. Esquilin commented on literature which suggested that Black children who have a positive and salient racial identity generally do better

---

[12] Paul's cousin's spouse was born in Africa.

overall academically and in life than those who do not. Ultimately, Dr. Esquilin opined that if Zaid remained with the resource family, his racial identity would not be fostered, and his contact with his biological relatives would also diminish.

As discussed more fully below, the court awarded KLG to Carol and Paul, noting the Division satisfied all four prongs of N.J.S.A. 3B:12A-6(d) by clear and convincing evidence. The biological father, Rob, consented to KLG with Carol and Paul, in line with Zaid's wishes.

## II.

Kim raises the following issues on appeal:

> THE TRIAL COURT INCORRECTLY DETERMINED THAT [THE DIVISION] HAD PROVEN BY CLEAR AND CONVINCING EVIDENCE THAT AN AWARD OF KLG TO RESOURCE CAREGIVERS, RATHER THAN KIM'S SISTER AVA AND HER SPOUSE, WAS IN ZAID'S BEST INTEREST UNDER PRONG FOUR OF N.J.S.A. 3B:12A-6(d).
>
> > A. The Court Erroneously Held that KLG With [Carol and Paul] Over KLG with . . . Ava Was in Zaid's Best Interest Where Intangible Aspects of Biological Relative Family Relationships Address Important Aspects of Race and Culture, Recognized In Current Law and Where Ava's Family Was Deemed Equally Capable of Caring For Zaid and Would Be Able to Address Any Distress From Being Placed In Their Care.

16

More particularly, Kim contends the court erred in determining an award of KLG to Carol and Paul was in Zaid's best interest. Principally, Kim argues—given Carol and Paul are White and Zaid is Black—the court erred in affording little weight to the racial and cultural concerns raised by the experts which ultimately resulted in awarding KLG to Carol and Paul as Zaid's permanent caregivers. Kim further asserts the trial court did not properly consider the July 2021 amendments to the KLG Act, N.J.S.A. 3B:12A-1 to -7, and that Ava and Dylan were better able to provide Zaid a stable and loving home, coupled with better insight and understanding regarding intangible ethnic and cultural issues involving young Black men. We are unpersuaded by these arguments—which both the Division and the Law Guardian oppose.

Our review of the Family Part judge's decision is limited. Cesare v. Cesare, 154 N.J. 394, 413 (1998). We are bound by the judge's factual findings so long as the findings are supported by sufficient credible evidence. N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007) (citing In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)). "[W]e [also] rely on the trial court's acceptance of the credibility of the expert's testimony and the court's fact-findings based thereon, noting that the trial court is better positioned to evaluate the witness' credibility, qualifications, and the weight to

be accorded [his or] her testimony." In re Guardianship of D.M.H., 161 N.J. 365, 382 (1999) (citing Bonnco Petrol, Inc. v. Epstein, 115 N.J. 599, 607 (1989)). Deference is also accorded to the trial court's findings of fact because the Family Part "possess[es] special expertise in the field of domestic relations." Cesare, 154 N.J. at 412-13. The trial court has "the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting M.M., 189 N.J. at 293). No deference is given to the trial court's interpretation of the law, which is reviewed de novo. D.W. v. R.W., 212 N.J. 232, 245-46 (2012).

KLG allows a person to become a child's legal guardian and care for that child until adulthood, without terminating the rights of the biological parents. N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 508 (2004).[13] KLG is designed "to address the needs of children who cannot reside with their parents due to their parents' incapacity or inability to raise them . . . ." N.J. Div. of Youth & Fam. Servs. v. S.F., 392 N.J. Super. 201, 209 (App. Div. 2007). A

---

[13] Birth parents retain the authority to consent to adoption or name changes and are also obligated to pay child support and retain the right to visitation or parenting time as determined by the court. N.J.S.A. 3B:12A-6(e)(2) to (5).

kinship legal guardian has the same rights and responsibilities as the parent and is "entitled to make all decisions relating to the care and well-being of the child." N.J. Div. of Youth & Fam. Servs. v. D.H., 398 N.J. Super. 333, 340 (App. Div. 2008).

Under the KLG Act, N.J.S.A. 3B:12A-1 to -7, the Division must satisfy the factors under N.J.S.A. 3B:12A-6(d) for appointment of a kinship legal guardian. The court shall appoint a kinship legal guardian if it finds the Division has proven the following prongs by clear and convincing evidence:

> (1) each parent's incapacity is of such a serious nature as to demonstrate that the parents are unable, unavailable or unwilling to perform the regular and expected functions of care and support of the child;
>
> (2) the parents' inability to perform those functions is unlikely to change in the foreseeable future;
>
> (3) in cases in which the [D]ivision is involved with the child as provided in [N.J.S.A. 30:4C-85(a)], the [D]ivision exercised reasonable efforts to reunify the child with the birth parents and these reunification efforts have proven unsuccessful or unnecessary; and
>
> (4) awarding kinship legal guardianship is in the child's best interests.[14]

---

[14] In determining the child's best interests, the court shall not award KLG of the child solely because of a parent's incapacity. N.J.S.A. 3B:12A-6(c). In evaluating whether to appoint a specific caregiver as a kinship legal guardian, the Family Part judge must consider the following factors:

[N.J.S.A. 3B:12A-6(d).]

A "kinship legal guardian" is defined as "a caregiver who is willing to assume care of a child due to parental incapacity, with the intent to raise the child to adulthood, and who is appointed the kinship legal guardian of the child

---

(1) if proper notice was provided to the child's parents;
(2) the best interests of the child;
(3) the kinship caregiver assessment;
(4) in cases [of Division involvement,] the recommendation of the [D]ivision, including any parenting time or visitation restrictions;
(5) the potential kinship legal guardian's ability to provide a safe and permanent home for the child;
(6) the wishes of the child's parents, if known to the court;
(7) the wishes of the child if the child is [twelve] years of age or older, unless unique circumstances exist that make the child's age irrelevant;
(8) the suitability of the kinship caregiver and the caregiver's family to raise the child;
(9) the ability of the kinship caregiver to assume full legal responsibility for the child;
(10) the commitment of the kinship caregiver and the caregiver's family to raise the child to adulthood;
(11) the results from the child abuse record check conducted pursuant to [N.J.S.A. 30:4C-86]; and
(12) the results from the criminal history record background check and domestic violence check conducted pursuant to [N.J.S.A. 30:4C-86].

[N.J.S.A. 3B:12A-6(a)].

by the court pursuant to [N.J.S.A. 3B:12A-1 to -7]."  N.J.S.A. 3B:12A-2; see also N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 223 (2010).  The term "caregiver" refers specifically to a person "who has a kinship relationship with the child and has been providing care and support for the child, while the child has been residing in the caregiver's home, for either the last six consecutive months or nine of the last [fifteen] months . . . [and] includes a resource family parent as defined in [N.J.S.A. 30:4C-26.4]."  N.J.S.A. 3B:12A-2.  N.J.S.A. 30:4C-26.4 defines "resource family parent" as "any person with whom a child in the care, custody, or guardianship of the [Division] is placed by the [Division], or with its approval, for care . . . ."  The Legislature defined a "kinship relationship" for purposes of KLG to include "a family friend or a person with a biological or legal relationship with the child."  N.J.S.A. 3B:12A-2.

The New Jersey Legislature recently amended the KLG Act, L. 2021, c. 154, (N.J.S.A. 3B:12A-1 to -7), and the amendments became effective July 2, 2021.  In amending the Act, the Legislature, in their findings and declarations preamble, determined that "[k]inship care is the preferred resource for children who must be removed from their birth parents because use of kinship care maintains children's connections with their families," and "there are many

benefits to placing children with relatives or other kinship caregivers, such as increased stability and safety as well as the ability to maintain family connections and cultural traditions." L. 2021, c. 154 § l(b).

On May 9, 2022, the trial court issued a thorough and comprehensive sixty-three-page written decision finding that the Division had proven by clear and convincing evidence all four prongs of N.J.S.A. 3B:12A-6(d) and awarded KLG to Carol and Paul.[15]

Initially, we note the court expressed concerns concerning the testimony of Dr. Esquilin. The trial court noted she "relied on broad assumptions about [Carol, Paul, and Ava]" and her "global concerns about systemic racism were

---

[15] As to the first prong, the court found that Kim's chronic alcohol use and unstable mental health rendered her unable to provide parental care and support to Zaid. Although she had progressed in her recovery, Kim's history demonstrated her inability to maintain sobriety for long periods of time. She was unable to recognize how her behaviors impacted Zaid, and Zaid does not wish to reunify with her. Regarding the second prong, the court also found that Kim was unwilling or unable to provide parental care and support to Zaid in the foreseeable future. Although there were times when Kim addressed her alcohol use and mental health issues, she was unable to maintain her sobriety. Moreover, none of the experts—including Dr. Esquilin—supported reunification. As to the third prong, the court found the Division made reasonable efforts towards reunification to no avail. For over eight years, the Division provided numerous services to Kim, including substance abuse evaluations, psychological evaluations, urine and hair testing, mental health services, payment for prescription medication, rental assistance, and in-home counseling.

out of place in this case."  The court observed that Dr. Esquilin had not conducted an interview with Ava or her family, which was a major "flaw" "undermin[ing]" her credibility.  Instead, Dr. Esquilin "assumed" that because Ava was Black she would be able to better educate Zaid about race than Carol and Paul.  The court noted Dr. Esquilin's lack of updated evaluations, coupled with her reliance on only Drs. Swanson's and Wells' reports and not on their raw data, further impacted her credibility.

In addressing the fourth prong, the court found that after considerable instability in his life, Zaid had finally found stability with Carol and Paul.  The judge commented:

> How [Zaid] began residing with the resource parents and became woven into their family is not in dispute.  [Kim] is an alcoholic who could not maintain her mental health, and she was chronically engaged in criminal activity.  [Zaid] has been repeatedly removed from [Kim's] care because of her inability to take care of herself.  [Zaid] was reunified and removed from [Kim's] custody four times between 2013 and 2018.  She last resided with [Zaid] on August 31, 2018.  [Zaid's father] essentially abandoned [Zaid].  Extended family was unable to provide long-term care for [Zaid], despite their love for him.  [Zaid's maternal grandmother, Yanni] asked for [Zaid]'s removal, and [Ava] was unable to care for [Zaid] in 2018 and 2019 because of her commitment to her family's military career and deployment obligations.  [Carol and Paul] were the only people willing and able to care for [Zaid]

23

in 2018, and that is where he stayed year after year while litigation churned.

With respect to bonds between Zaid, Carol, Paul, Jack, and Sara, the court noted:

> [Zaid] became integrated into the resource family, so much so that he refers to the resource parents' children as his brother and sister. [Zaid] does not consider himself a foster child—only [Kim] constantly reminds him of that fact. To [Zaid], he is home. He craves stability and he wants to be adopted by [Carol and Paul]. If he cannot be adopted as a minor, the resource parents and [Zaid] intend to initiate an adult adoption after he turns eighteen years old. That vow speaks to the strength of [Zaid]'s bond with his resource family. [Carol and Paul] are committed to care for [Zaid] until adulthood, in whatever legal form it takes to provide him with the stability he deserves.
>
> [Zaid] does not want to leave, and nobody else wants him to, except [Kim]. She would rather uproot [Zaid] from the only family he has known during his tumultuous childhood and force him to re-establish his social network and sports relationships in Texas at the age of fifteen. If [Zaid] were required to move to Texas against his wishes, he would not only lose the only stability he has had in his life, but he would become disconnected with [Kim], who he enjoys in a limited capacity under controlled circumstances. Why would [Kim] advocate this outcome? Because she irrationally fears the resource parents will cut her off from [Zaid]. There was no evidence adduced at trial to substantiate that fear. [Kim], [Carol, and Paul] reside[] in the same neighborhood, approximately five minutes from each other. If [Zaid] were to be placed with [Ava] in Texas, [Kim] could not maintain the weekly physical contact

24

she has with [Zaid].  It is certainly not in [Zaid]'s best interests to move to Texas, so far from his mother.

The court proceeded to address the cultural issues raised by Kim and the importance of stability to Zaid.  The court stated:

> [Kim] made a great deal about the cultural differences between [Zaid] . . . and the resource family . . . .  [That]  is not a barrier to [Zaid]'s health, happiness, or safety.
>
> . . . .
>
> [Kim] tried to make a case that [Zaid] will be better off living with his [Black] aunt in Texas rather than the [White] resource family that [Zaid] has bonded with for the past three years.  [Zaid] did not agree.  During the court's interview with [Zaid], he was unequivocal in his preference.  This is a case about stability.  [Zaid] has been living with [Carol and Paul] for over three and a half years, and he is fully integrated into their family system.  [Jack] and [Sara] are [Zaid]'s siblings and [Zaid] is part of the . . . family.  [Ava], although loving and fun, is a distant aunt who [Zaid] does not feel a strong connection.  Had [Ava] presented herself as a kinship placement option in August 2018, when [Zaid] needed a place to live, a KLG could have been entertained and granted.  The window for KLG with [Ava] is now closed.  [Zaid] is fifteen and will be entering high school with his friends in the Fall of 2022.  He has an established social network of friends, a family who loves him and wants to provide him with stability, and a relationship with his mother that he enjoys.  [KLG] with [Ava] in Texas would wipe out all the stability [Zaid] has achieved in the last three years and create undue distress.

25

> For these reasons, the court finds it is in the best interest of [Zaid] to continue to reside with [Carol and Paul] under a [KLG]. . . .

The court further referenced Dr. Swanson's testimony where she noted it was better for Zaid to remain with Carol and Paul, notwithstanding their cultural differences. Although Carol and Paul could take steps to better understanding the Black experience in America, Dr. Swanson concluded they had an open attitude about race and the Black culture, and exposure to Black role models could assist in addressing these issues with Zaid. The court found Dr. Swanson's opinions to be "reasonable, practical and sound."

Following our review of this matter, we are satisfied there was ample evidence in the record to support the court's conclusion, and we affirm substantially for the reasons set forth in the court's in-depth and detailed decision. We add the following.

The Division presented clear and convincing evidence to satisfy all four prongs. After much disorder and disruption in his life as a result of Kim's various issues, Zaid found safety, stability, and a secure bond with Paul, Carol, and their children, where he resided for over three years at the time of the KLG trial. They willingly took on this significant responsibility at a time when other family members were unable to care for Zaid. The court's determination that it

26

would not be in Zaid's best interest to uproot him from his current family at this juncture is well supported by the record.

The court appropriately considered the importance of cultural issues in the context of this case and the expert testimony on this issue. Ultimately, the court determined this issue alone was not dispositive in awarding KLG to Carol and Paul. Although the experts generally agreed that Ava and Dylan were capable caregivers and had the present desire and ability to serve as KLGs, the court determined this alternative was not in Zaid's best interest. This is by no means a negative reflection on Ava and Dylan. Rather, under the totality of the circumstances, the court found: the stability provided to Zaid by Carol and Paul over the past several years; Zaid's steadfast desire to remain with the only stable family he has known; his integration into Carol and Paul's family, Zaid viewing Jack and Sara as his siblings; his connection with local schools, friends, and his involvement in athletics; and his attenuated relationship with Ava and steadfast reluctance to be placed with Ava or relocate to Texas at this point in his life[16]—which all strongly support the court's conclusions in this matter. We agree there was sufficient credible evidence in the record to support these findings and discern no reason to disturb the court's decision.

---

[16] We note Zaid reaches the age of majority in December 2024.

Finally, to the extent we have not otherwise addressed any of defendant's other arguments, we determine they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2931-21