942 A.2d 41

DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF–
RESPONDENT, v. D.H. AND J.V., DEFENDANTS–
RESPONDENTS.

IN THE MATTER OF THE GUARDIANSHIP
OF D.H., A MINOR, APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued December 12, 2007—Decided February 21, 2008.

334

Before Judges A.A. RODRÍGUEZ, C.S. FISHER and C.L. MINIMAN.

*Christopher A. Huling,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, Law Guardian, attorney; *Mr. Huling,* of counsel and on the brief).

*Peter Alvino,* Deputy Attorney General, argued the cause for respondent Division of Youth and Family Services (*Anne Milgram,* Attorney General, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Mr. Alvino,* on the brief).

*Evangeline Gomez,* Assistant Deputy Public Defender, argued the cause for respondent D.H. (*Yvonne Smith Segars,* Public Defender, attorney; *Ms. Gomez,* on the brief).

The opinion of the court was delivered by

A.A. RODRÍGUEZ, J.A.D.

In this opinion, we hold that Kinship Legal Guardianship (KLG) pursuant to the Kinship Legal Guardianship Act (KLG Act), *N.J.S.A.* 3B:12A–1 to –7 is deemed to be a permanent placement option in the appropriate circumstances specified in the statute.

This is an interlocutory appeal [1] by the Law Guardian on behalf of A.H., a five-year-old girl, from the March 14, 2007 Order approving the Division of Youth and Family Service's (DYFS) permanency plan to terminate the birth parents' rights followed by select-home adoption. In doing so, the judge rejected as an option KLG by the maternal grandmother, K.P. The judge found that, "based on the child's age, termination would be the more appropriate goal."

The Law Guardian contends that because A.H. has been in the custody of her maternal grandmother for seventeen months and the grandmother does not wish to adopt her, but instead wants the child to live with her on a long-term basis, a permanency plan that calls for adoption by strangers is not in A.H.'s best interests. The Law Guardian also contends that KLG is the appropriate permanency plan and the judge should have considered this alternative to termination of parental rights. We agree and reverse.

---

[1] We granted leave to appeal on May 24, 2007 (M–4926–06).

## I

D.H. is A.H.'s birth mother and J.V. is the birth father. DYFS first became involved with this family in January 2006, when the birth father, who had court-ordered visitation with A.H., was refused such visitation by the mother. The mother, who belongs to the Ifa religion, refused to allow J.V. visitation because her Ifa minister, claiming the power to communicate with spirits, advised her against it. The minister told the mother that the spirits revealed that the father's brother had inserted his pinky finger into A.H.'s vagina when she was two years old.

DYFS's Special Response Unit and the police visited the home to conduct an investigation. The DYFS worker noticed that the front door was covered with chalk markings of a cross and an angel. After speaking with the mother, it was confirmed that she practiced the Ifa religion. The mother stated that she believed A.H. had been molested by her paternal uncle, who lives with the child's father. DYFS was unable to speak with the child during this visit because she was sleeping.

On that same day, the DYFS worker visited the father, who stated that he disapproved of the mother's involvement with the Ifa religion. He also expressed concern over A.H.'s well-being and requested that she be examined by a mental health physician. A few days later, the DYFS worker learned that the mother had been admitted to the psychiatric unit at Saint Mary's Hospital at her family's insistence. A.H. was left in the care of her maternal grandmother, K.P.

Subsequently, a DYFS worker interviewed A.H. The worker saw no marks or bruises on A.H. When the DYFS worker attempted to interview A.H. alone, the child clung to her grandmother and did not want her to leave. The DYFS worker concluded that A.H. was very attached to K.P. On that same day, the DYFS worker spoke with K.P., who expressed concerns about the molestation allegations and her belief that the mother was unfit to care for A.H. as a result of her religious beliefs.

In due course, a Family Part judge granted sole legal custody of A.H. to her father, who allowed A.H. to remain in the physical custody of K.P. while he arranged for childcare. K.P. was granted visitation. The mother was allowed supervised visits. Three months later, because she was not taking her prescribed medications, the judge suspended the mother's visitation.

In March 2006, the father submitted a urine sample that tested positive for cocaine and opiates. DYFS removed A.H. from her father's care and placed her with K.P. temporarily. DYFS filed a verified complaint seeking custody, care and supervision of A.H. pursuant to *N.J.S.A.* 9:6–8.21 to –8.73 and *N.J.S.A.* 30:4C–12. A different judge granted DYFS legal custody of A.H. DYFS placed the child with K.P.

More than a year later, on March 14, 2006, the judge held a permanency hearing, at which the birth parents were represented by counsel. K.P. was also present. DYFS indicated that its permanency plan for A.H. was termination of parental rights followed by select-home adoption. The Law Guardian agreed that both parents were either "unable or unwilling to care for [A.H.]," but urged that the court accept KLG with the maternal grandmother as the permanency plan. The grandmother told the judge, "I really don't want to give [A.H.] to anybody else[;] I'm happy, she's happy...."

The judge approved DYFS's permanency plan, finding that A.H. was entitled to "a permanently defined parent/child relationship without this intrusion ... that [KLG] offers...." He also found that, "[i]t's not reasonable to believe at this time that [the mother and the father] would be reliable caregivers." The judge noted that:

> [The mother] has what appears to be significant mental health issues, which she has not received treatment for. Currently she does not have a stable living arrangement. [The father] is not offering himself as a caregiver.

The judge made the following comment to the grandmother:

> Ms. [K.P.], I don't want you to take any statement that I made or [the Deputy Attorney General] may have made as a threat, okay? It's a statement of fact that there are various options that exist, one of which is termination of parental rights

so the child can be adopted, whether it's by you or somebody else. Again, it's an open question don't take that as a threat.

[The Law Guardian] is arguing and may convince me at some time that [KLG] is [a] more appropriate resolution, okay?

The Law Guardian moved to stay the scheduled guardianship trial pending our decision on the appeal. We granted the stay on August 21, 2007. (M–7255–06).

## II

On appeal, the Law Guardian and the mother both argue that the judge erred in accepting DYFS's permanency plan to terminate parental rights because KLG is the appropriate permanent placement alternative, and select-home adoption is not in the best interests of A.H. The Law Guardian argues that the judge ignored the legislative mandate, which makes KLG a permanent option in these circumstances. We agree.

 The Child Placement Review Act (CPRA), *N.J.S.A.* 30:4C–50 to –65, declares that it is in the "public interest to afford every child placed outside his home by [DYFS] ... with the opportunity for eventual return to his home or placement in an alternative permanent home." *N.J.S.A.* 30:4C–51. The CPRA establishes procedures for administrative and judicial review of each child's placement in order to ensure that the placement serves the best interest of the child. *Ibid.* The Family Part is charged with reviewing and approving any permanency plan put forth by DYFS within twelve months after a child has been in placement. *N.J.S.A.* 30:4C–61.2a(2). At this proceeding, the judge must consider and evaluate all alternatives for the long-term permanent placement of the child. *N.J.S.A.* 30:4C–61.2c. When reviewing the permanency plan recommended by DYFS, the judge must determine whether such plan "ensures the safety and health and serves the best interests of the child." *N.J.S.A.* 30:4C–51. This is consistent with the well settled principle that, "the best interests of the child is the polestar in the implementation of a placement plan." *State in the Interest of L.L.,* 265 *N.J.Super.* 68,

77, 625 *A.2d* 559 (App.Div.1993) (internal quotation omitted). The trial court must structure its analysis by taking into consideration all relevant evidence in the record, including the recommendations by DYFS, as well as information obtained from other pertinent sources relating to the welfare of the child. *See N.J.S.A.* 30:4C–61; *see also In re C.R.,* 364 *N.J.Super.* 263, 279, 835 *A.2d* 340 (App.Div.2003), *certif. denied,* 179 *N.J.* 369, 845 *A.2d* 1252 (2004). Thus, the crucial question is "whether [DYFS's] proposed placement plan satisfies the legislative goals and objectives of the [CPRA] by providing a stable, safe and healthy environment for the child considering *all* of the circumstances surrounding the placement." *L.L., supra,* 265 *N.J.Super.* at 79, 625 *A.2d* 559. This determination is made based on the evidence as it exists at the time of the permanency hearing. *N.J. Div. of Youth & Family Servs. v. M.F.,* 357 *N.J.Super.* 515, 527, 815 *A.2d* 1029 (App.Div.2003).

The best interests of the child standard is set by *N.J.S.A.* 30:4C–15. This statute requires that DYFS prove by clear and convincing evidence that termination of parental rights is warranted based on four factors:

(1) The child's safety, health or development have been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm.

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[*N.J.S.A.* 30:4C–15.1a.]

These four elements overlap and are considered a comprehensive standard that identifies a child's best interests. *In re Guardianship of K.H.O.,* 161 *N.J.* 337, 348, 736 *A.2d* 1246 (1999).

■ The KLG Act provides an alternative to termination of parental rights and subsequent adoption. This is a relatively new concept in New Jersey. *N.J. Div. of Youth & Family Servs. v.*

*P.P.*, 180 *N.J.* 494, 507, 852 *A.*2d 1093 (2004). In enacting the KLG Act, the Legislature declared that:

 a. There is an increase in the number of children who cannot reside with their parents due to the parents' incapacity or inability to perform the regular and expected functions of care and support of the child;

 b. An increasing number of relatives, including grandparents, find themselves providing care on a long-term basis to these children without court approved legal guardianship status because the caregivers either are unable or unwilling to seek termination of the legal relationships between the birth parent and the child, particularly when it is the caregiver's own child or sibling who is the parent. In these cases, adoption of the child is neither feasible nor likely, and it is imperative that the State create an alternative, permanent legal arrangement for children and their caregivers. One such alternative arrangement, which does not require the termination of parental rights, is a court awarded kinship legal guardianship that is intended to be *permanent and self-sustaining,* as evidenced by the transfer to the caregiver of certain parental rights, but retains the birth parents' rights to consent to adoption, the obligation to pay child support, and the parents' right to have some ongoing contact with the child;

 c. In considering kinship legal guardianship, the State is seeking to add another alternative, *permanent placement option,* beyond custody, without rising to the level of termination of parental rights, for caregivers in relationships where adoption is neither feasible nor likely; and

 d. Therefore, it is in the public interest to create a new type of legal guardianship that addresses the needs of children and caregivers in long-term kinship relationships.

[*N.J.S.A.* 3B:12A–1 (emphasis added).]

Therefore, when adoption is neither feasible nor likely, particularly when the kinship caregiver's own child or sibling is the birth parent, an alternative to termination is desirable. *P.P., supra,* 180 *N.J.* at 508, 852 *A.*2d 1093. A kinship legal guardian will typically be a caregiver with a "biological, legal, extended or committed emotional or psychological relationship with a child and who [is] willing to assume care of the child due to parental incapacity or inability, with the intent to raise the child to adulthood." *Ibid.* Once the caregiver becomes a kinship legal guardian, the caregiver is entitled to make all decisions relating to the care and well-being of the child. *N.J.S.A.* 3B:12A–4a(1). The Legislature "clearly intended to formalize the status of a relative who agrees to take on the responsibility for a child, *see N.J.S.A.* 3B:12A–4a(1), and can remain in place throughout the child's minority, *N.J.S.A.*

3B:12A–4a(6)." *N.J. Div. of Youth & Family Servs. v. S.V.*, 362 *N.J.Super.* 76, 87, 826 *A.2d* 821 (App.Div.2003).

KLG, however, does not terminate parental rights. *N.J.S.A.* 3B:12A–4a(2)–(5). The birth parents retain the right to: (1) consent to adoption, *N.J.S.A.* 3B:12A–4a(2); (2) change the child's name, *N.J.S.A.* 3B:12A–4a(2); and (3) visit the child, *N.J.S.A.* 3B:12A–4a(4). The birth parents also remain obligated to pay child support. *N.J.S.A.* 3B:12A–4a(3). Additionally, children are still eligible to receive inheritance, benefits, or insurance from their birth parents. *N.J.S.A.* 3B:12A–4a(5).

▮ In order to establish that appointment of a KLG is appropriate, the court must find, by clear and convincing evidence, that:

(1) each parent's incapacity is of such a serious nature as to demonstrate that the parents are unable, unavailable or unwilling to perform the regular and expected functions of care and support of the child;

(2) the parents' inability to perform those functions is unlikely to change in the foreseeable future;

(3) in cases in which [DYFS] is involved with the child ... (a) [DYFS] exercised reasonable efforts to reunify the child with the birth parents and these reunification efforts have proven unsuccessful or unnecessary; and (b) adoption of the child is neither feasible nor likely; and

(4) awarding kinship legal guardianship is in the child's best interests.

[*N.J.S.A.* 3B:12A–6d.]

If adoption is readily available, however, KLG cannot be used to defend against termination of parental rights. *P.P.*, *supra*, 180 *N.J.* at 513, 852 *A.2d* 1093. For example, in *N.J. Div. of Youth & Family Servs. v. S.F.*, 392 *N.J.Super.* 201, 213, 920 *A.2d* 652 (App.Div.2007), we determined that KLG was appropriate because the grandparents, although committed to caring for their grandchildren, were unwilling to adopt them.

▮ Here, it is clear from the record that both birth parents are unable to provide a stable, safe and healthy environment for A.H. The mother has been clinically diagnosed with psychiatric problems and has not received appropriate treatment for her condition. She has also repeatedly failed to comply with DYFS recommendations, and is currently unemployed and living temporarily with a

friend. The father was recently incarcerated. He disappeared upon his release from custody without contacting DYFS or appearing for scheduled court appearances. In fact, his appearance at the permanency hearing was the first time he participated in court proceedings for several months because he could not be located. He has also previously tested positive for cocaine and opiates and has failed to complete a substance abuse treatment program. Moreover, he admitted during the permanency hearing that he is not in a position to care for A.H., now or into the near future. Still, it is evident from the trial record that there is a close bond between A.H. and her two birth parents.

One of the reasons the judge rejected KLG was because he did not view it as a permanency plan. However, the plain language of the KLG Act indicates that the Legislature intended KLG to be an alternative permanency plan to severing parental rights. *N.J.S.A.* 3B:12A–1c. Specifically, the KLG Act declares such relationship "to be permanent and self-sustaining." *N.J.S.A.* 3B:12A–1b.

The judge also rejected KLG as a permanency plan because he was particularly concerned that this would allow the birth parents to retain some of their parental rights. The judge stated:

> Because the child is entitled to a permanently defined parent/child relationship without this intrusion so to speak that kinship guardian offers or what custody would offer that the parents can come back and forth, try to intrude on the life of [K.P.], dictate what [K.P.] should do.

> [K]inship guardian custody makes the revolving door that any time [J.V.] or [D.H.] wants to they could come to court, make application, inconvenience [K.P.] and have her come to court for maybe no reason.

The Legislature, however, specifically provided that birth parents should retain such rights.

In this case, K.P. is unwilling to adopt A.H. because she believes that adoption would only cause family turmoil. She also wishes to continue to care for A.H. on a long-term basis. The evidence shows that K.P. has provided A.H. with a stable, permanent home for over a year-and-a-half. The record also shows that, as A.H.'s caregiver, K.P. has helped to improve A.H.'s performance and behavior in school, and has attempted to obtain special services,

such as a language specialist, to assist with a reported speech delay. Furthermore, K.P. has complied with all of DYFS's recommendations, including supervising any visits between A.H. and her parents.

Likewise, DYFS has noted the excellent job K.P. has done in caring for A.H. Indeed, DYFS never raised any opposition to K.P. retaining physical custody of A.H. To the contrary, DYFS indicated during the permanency hearing that it would not oppose an adoption of the child by K.P., if she wished to do so. Most importantly, A.H. loves living with her grandmother. According to the Law Guardian, removing A.H. from K.P.'s home would only cause her emotional and psychological harm.

### III

On appeal, the Law Guardian also contends that a disparity exists between the application of the KLG Act in DYFS and non-DYFS cases. Specifically, the Law Guardian argues that DYFS has violated equal protection principles because of its failure to apply the provision of the KLG Act determining whether "adoption is neither feasible nor likely" in a universal manner. The Law Guardian argues that grandparents seeking to become kinship legal guardians in non-DYFS cases are allowed to do so without any consideration being given to whether adoption of that child is feasible or likely by a third-party.

We reject this argument because the KLG Act limits the requirement that adoption is "neither feasible nor likely" to those cases where DYFS is involved. *N.J.S.A.* 3B:12A–6d(3).

### IV

Accordingly, the permanency order is reversed. The matter is remanded to the Chancery Division, Family Part, Hudson County, for a new permanency hearing. We do not retain jurisdiction.