# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2259-23
       A-2260-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

 Plaintiff-Respondent,

v.

E.A. and G.A.,[1]

 Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF K.A.,
a minor.

_____

Submitted January 7, 2025 – Decided January 24, 2025

Before Judges Firko and Augostini.

---

[1] We use initials and fictitious names from the briefs in our opinion to protect the parties' privacy and because records relating to proceedings held under Rule 5:12 are excluded from public access under Rule 1:38-3(d)(12).

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Ocean County, Docket No. FG-15-0016-22.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant E.A. (Louis W. Skinner, Designated Counsel, on the briefs).

Jennifer Nicole Sellitti, Public Defender, attorney for appellant G.A. (Bruce P. Lee, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Mary L. Harpster, Deputy Attorney General, on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; David B. Valentin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

In these consolidated appeals, defendant E.A. (Erin), the biological mother of minor K.A. (Kaine), and defendant G.A. (George), the minor's biological father, seek reversal of the final judgment of guardianship the Family Part entered on March 7, 2024, in favor of the Division of Child Protection and Permanency (the Division). The judgment terminated defendants' respective parental rights after trial. The Law Guardian for the minor joins with the Division in opposing the appeals.

2

A-2259-23

Erin and George contend the Division failed to prove the four prongs of the best-interests-of-the-child statutory test set forth in N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. After carefully reviewing the record in light of the parties' arguments and governing legal principles, we affirm substantially for the reasons set forth in Judge Deborah S. Hanlon-Schron's thorough and well-reasoned oral opinion. We are not persuaded by Erin's and George's arguments to the contrary.

I.

Given that the parties are well familiar with the extensive factual and procedural background of this matter, and the record of the four-day trial, we need not detail that background in our opinion. The following pertinent facts and information will suffice. Kaine was born in June 2010. Erin was born in West Africa and came to the United States in 1990. George was born in Ghana and came to this country when he was in his late twenties. Erin and George were married in 2001. They have four children in common, including Kaine, and a child who regrettably died in 2013. Erin and George each also have children from other relationships.

On August 27, 2019, the Division received a referral that Kaine and his minor brother Ezra were living with George, who did not appear capable of

parenting the children on his own. The referent reported the family did not have running water for a week, and the children "smelled as if they did not shower." Their home was described as "disgusting" and "looked like filth." Erin was not regularly at the home and visited approximately twice per week to drop off groceries.

Division case workers Allison Muso and Lisa Pinsdorf responded to the referral. The home was observed to have mold, flying insects, a drooping ceiling, a strong odor, piles of clothing and garbage, the children's mattresses were dirty with no bedding, missing floorboards in the kitchen, no running water, and limited food. George was receiving social security payments. Erin advised the Division that she had no financial means to assist the children and offered no placement alternatives.

In response, the Division instituted a safety protection plan. George and Ezra were housed in a hotel and George agreed that Kaine could stay with a neighbor, S.D. (Sara).[2] The Division contacted Erin about addressing the issues at the home, and she agreed to have it cleaned and repaired. Erin reported she was going to sign a lease for a condominium and that George, Kaine, and Ezra

---

[2] Sara was willing to allow Kaine to stay in the house but not Ezra because of his behaviors, such as not understanding boundaries and pushing their then four-year-old child down.

4

could move in with her. Erin made some attempts to clean the home but admitted she did not have a contractor as she previously represented. After George and Ezra spent three nights at the hotel, their room had a "strong smell" of body odor and urine, and there was garbage thrown all over.

On September 16, 2019, the Division was granted physical custody of Kaine and Ezra. Kaine continued to stay with Sara and her husband. The next day, George admitted he was unable to care for the children because their needs were significant, and he was "too old at age eighty." Kaine was indifferent about visiting Erin but wanted to visit George. The Division substantiated Erin and established George for their failure to provide for their children's basic needs.

In November 2019, George began living in a nursing home. The judge ordered Erin to undergo a psychological evaluation and to attend parenting classes. George stated he was "too old" to be reunified but the family agreed that reunification with Erin was the goal. Notwithstanding this goal, Erin did not attend scheduled evaluations or parenting classes for the next year.

The Division arranged for visits between George, Kaine, and Ezra at the nursing home until in-person visits were suspended in March of 2020, due to the COVID-19 pandemic. George maintained daily phone and sometimes video

visits until in-person visits were resumed in August 2020. Erin visited Kaine four times in five months and was inconsistent in answering his phone calls.

The Division continued to stress to Erin the importance of undergoing the psychological evaluation, which ultimately occurred on September 29, 2020, with Alan J. Lee, Psy.D. Dr. Lee recommended Erin attend individual counseling, parenting classes, and a re-evaluation. He advised against Erin being an independent caretaker. Dr. Lee concluded Erin had average intelligence and may have neurological impairment. Dr. Lee described Erin as "extremely self-centered and egocentric and has a heightened level of resentment and grandiosity." He opined Erin is prone to "some irrational fears, impaired empathy, episodic poor control of her anger" and was "psychologically less mature and developed than most adults."

Dr. Lee diagnosed Erin with disruptive impulse-control and conduct disorder, and an unspecified personality disorder with narcissistic and avoidant traits. Dr. Lee recommended Erin attend individual therapy to address her "maladaptive personality and character traits, improve her empathy, [and] develop better ways of hand[l]ing her emotions."

<u>The First Guardianship Litigation</u>

On September 30, 2020, the Division filed an order to show cause application and a verified complaint[3] seeking guardianship of Kaine. At a later compliance hearing, George was ordered to attend a psychological evaluation with Dr. Lee and Erin was ordered to comply with all of Dr. Lee's recommendations. George missed six appointments scheduled with Dr. Lee. Erin failed to attend parenting classes.

On October 14, 2020, during a supervised visit with Kaine and Ezra, George became agitated and combative when told he had to cease telling Kaine to refuse to be adopted. George yelled, told the children the Division was going to "sell them," and grabbed the case worker, Melissa Cocco, by the arm. The case worker advised George that future visits would be cancelled if he put his hands on any Division case worker. Erin continued to not comply with attending parenting classes and individual counseling.

On March 25, 2021, Erin moved into a "spacious and well-kept" home. George moved in with her and the Division arranged for his visits to take place in the home. Erin was barred from George's visits by virtue of a court order. A few weeks later, during an April 12, 2021, phone call, George advised Cocco

---

[3] Docket Number FG-15-09-21.

there was "no way [he] can take care of the children anymore," he only wanted to spend time with them, and Erin was hiring someone to take care of them. Erin and George continued with supervised and therapeutic visitations through May 2021. Kaine's visits with Erin were "abrupt" and her behavior did not improve over time. During one visit, Erin called herself a "witch" and told the case worker—Cocco—she would "spiritually" harm Cocco's children. Counselor Mary Holt noted that Erin "did not provide validation or emotional support throughout the visit" and "needed redirection and explanations of what [Kaine] was feeling." Erin later told Holt that she was going to coach Kaine to state he was coming home with her.

Sara asked that Kaine be removed from her home because she did not want to deal with Erin and George any longer. On August 6, 2021, the Division placed Kaine with M.H. (Muriel) and M.H. (Martin).

The first guardianship trial was adjourned because Kaine told Sara he wanted to be reunified with Erin and George. The judge ordered Erin and George to attend psychological evaluations with Dr. Lee. On August 17, 2021, George was scheduled to be evaluated by Dr. Lee. However, Dr. Lee could not perform the evaluation because George was unable to read the printed materials given to him without his reading glasses. A week later, the judge dismissed the

8

litigation under FG-15-09-21 and ordered Kaine to be monitored under an FN docket.

Eventually, Dr. Lee evaluated George, who struggled to maintain concentration. Based on his testing and interview, Dr. Lee opined that George had "significant cognitive and intellectual issues and impairment," with an IQ of 74. Dr. Lee noted George had significant coping and problem-solving difficulties, and was "rather grandiose, self-centered and entitled." Dr. Lee reported that George's knowledge of parenting and child-rearing was "limited and poor," and he was unable to parent Kaine within the foreseeable future.

Dr. Lee also conducted a bonding evaluation between Kaine and George. Kaine told Dr. Lee that George "smacked" him hard and "kicked" him in the past. George denied ever hitting Kaine. Dr. Lee concluded that Kaine did not have a significant and positive attachment with George.

Erin was discharged from her individual therapy due to inconsistent attendance. The Division referred Erin to another therapist but the agency was unwilling to work with her because she made threatening comments to her clinician. Erin also made untoward statements to Cocco, alleging racial discrimination for not returning Kaine to her custody, the Division stole her children, and that Dr. Lee was a liar.

Following an emergent hearing on February 18, 2022, the judge ordered that George's parenting time would no longer take place at the family's home due to safety concerns for the Division's staff in light of Erin's threatening communications to Cocco. The judge ruled George would not be notified about where visits would occur to avoid the possibility of Erin appearing. For the rest of February and March 2022, George's and Erin's visitations were cancelled at either Kaine's request or George's unwillingness to attend visitation in the community. On March 30, 2022, Erin commenced individual therapy with Paschal Igwe, Ph.D.

As of August 29, 2022, Erin and George both failed to complete court-ordered services and comply with court orders. And, Kaine no longer wanted reunification with his parents. Consequently, the Division changed the goal to termination of parental rights followed by adoption, concurrent with reunification efforts.

The Second Guardianship Trial

On May 31, 2022, the Division filed a complaint for guardianship, the operative pleading in this matter. As of June 15, 2022, Erin had not completed her parenting program recommended by Dr. Lee, her individual therapy, therapeutic visitations, or updated psychological evaluation. George also had

A-2259-23

not engaged in services recommended by Dr. Lee. Kaine refused visits with Erin. The Division updated their individual and family assessments and noted George had not visited Kaine between August and October 2022. George was re-admitted to a nursing home and was diagnosed with dementia (which was later deemed incorrect), psychotic disturbance, mood disturbance, anxiety, and ataxia (loss of motor control). The Division canceled George's psychological evaluation in light of these developments.

On November 30, 2022, Erin was re-evaluated by Dr. Lee. Based on her interview and testing, Dr. Lee concluded that Erin had cognitive and intellectual difficulties, entrenched and maladaptive personality and character traits, and her parenting skills remained limited. Erin's overall intelligence score was a 61. Dr. Lee characterized Erin as a "minimally adequate parent" at that time and in the foreseeable future, and her prognosis for change was poor.

On April 4, 2023, Dr. Lee conducted a psychological evaluation of Kaine. According to Kaine, he visited George weekly but did not have visits with Erin. Kaine recalled his parents argued frequently and that Erin beat George "badly." Kaine also reported that Erin drank alcohol to the point her eyes rolled back in her head. Kaine told Dr. Lee that he wished to be adopted by his resource parents. Dr. Lee observed that Kaine had "no remarkable sense of loss in not

11

having a relationship with his birthparents at this point or in the future." Dr. Lee found Kaine was "fairly well[-]adjusted," but had some emotional delays. Dr. Lee recommended Kaine would benefit from continued structure, consistency, predictability, and nurturance, and might regress if not provided with these things. Dr. Lee concluded permanency was important for Kaine, and he needed stability instead of the uncertainty he faced with Erin and George.

On June 1, 2023, George was moved from the nursing home to a permanent assisted living facility. Erin suggested her aunt as a possible resource parent for Kaine but Erin failed to appear for a meeting to provide details about the aunt. George refused to participate in a psychological evaluation with Dr. Quintana[4] and refused to comply with a paternity test. The judge found George was "legally presumed" to be Kaine's father. Under Rule 4:26-2(b)(4)[5], the judge appointed a guardian ad litem for George based on her concern over his mental capacity. Erin and George were ordered to provide their reunification plans to the Division.

---

[4] Dr. Quintana's first name is not provided in the record.

[5] Under Rule 4:26-2(b)(4), the court may appoint a guardian ad litem for a minor or alleged or adjudicated incapacitated person on its own motion.

On August 15, 2023, Dr. Igwe provided an updated therapy report regarding Erin. Dr. Igwe noted his prior evaluations did not take into consideration Erin's cultural background and that George was "physically violent," but Erin permitted the children to remain with him because she had no one else to raise them. Kaine's resource parents remained committed to adopting him.

At the trial, the Division called case workers Cocco, Nicole Steimle, Dr. Lee, Dr. Igwe, Kaine, and Muriel as witnesses. Cocco detailed her experience with the family over a two-year period. Cocco testified how Kaine refused to visit Erin, and about the threatening voicemails she received from Erin, which were usually overnight. Cocco stated Erin left a voicemail that she knew where Cocco lived and left the address on the voicemail. Cocco testified that Erin failed to appear for two psychological evaluations with Dr. David Brandwein in the past but later was evaluated by Dr. Lee.

Based on Dr. Lee's recommendations, Cocco testified she set up parenting classes through St. Francis and individual therapy through the St. Francis Ocean Reunification program, but Erin was discharged due to poor attendance. Cocco stated Erin was later referred to the Mercy Center for a parenting class and completed the class but was negatively discharged from individual therapy.

Cocco stated that George visited Kaine fairly consistently, but did not return any of her phone calls from March to September 2022. In addition, Cocco testified about Kaine's experience at the resource home and her discussions with the resource parents on Kinship Legal Guardianship (KLG).

Steimle testified she explored possible relative placements with Erin, who provided the names of three individuals. Erin was unable to provide any information about one of the individuals, who is her aunt, the other individual resided in New York and would not move to New Jersey, and the third individual did not agree to be assessed for placement. Steimle stated that George did not provide any potential relative placements. Steimle testified Kaine told her that he wanted to be adopted.

Dr. Igwe testified that the focus of Erin's therapy "in general was about her own separation anxiety." Dr. Igwe opined Erin had "underlying issues that she was dealing with, [relating to] trauma," including several miscarriages. He maintained that Erin "was doing all she could as a mom . . . to strengthen the bond between herself and her kid. . . ." Dr. Igwe noted that Erin "can be very emotional and that is the way she communicates."

Kaine testified in camera that on "a lot of nights," prior to his removal from his parents' home, the family did not eat. Kaine stated that George took

14

care of the children. Kaine indicated that George "couldn't really like wash dishes . . . or like clean the house" and Erin did not clean the house. According to Kaine, Erin only came to the home approximately once per month and called "only sometimes." Kaine indicated that George did not drive, so they would walk to a "Luigi's" for food.

Kaine recalled his parents would argue and that "it would get physical," and Erin would hit George when they argued. Kaine expressed he wished to continue visits with George, but not Erin. Kaine testified he did not want to live with Erin or George, recognized George could not take care of him, and that his parents could not keep him "safe." Kaine indicated he wanted to be adopted by his resource parents.

Muriel testified that Kaine had been with her and her family for two years and four months at the time of trial. Muriel testified about her understanding of KLG versus adoption, stating "adoption is a finalization . . . [w]ith KLG . . . the child stays in your home, still has contact with [his or her] parents, and at any point that the parents become capable of rekindling the relationship or can take care of them, [then] they can return."

Muriel explained her understanding that KLG could be a permanent plan, but she did not want Kaine to be faced with going "back and forth." Muriel

A-2259-23

testified that she and Martin would not consider KLG even if adoption was not in Kaine's best interests. Muriel testified that Kaine chose not to see Erin. However, because Kaine has a close relationship with George, Muriel was in favor of maintaining visitation between Kaine and George.

Dr. Lee described the psychological evaluations he performed of Erin, George, and Kaine, and the bonding evaluation he had conducted concerning Kaine and George[6]. Dr. Lee testified that he reviewed the report of George's therapist, who concluded George showed no evidence of dementia or cognitive decline. However, Dr. Lee testified that George had limited knowledge of "common parenting practices" and was not a "minimally adequate parent" or independent caretaker to Kaine in the present or in the foreseeable future.

Regarding Erin, Dr. Lee testified she viewed herself "in a very problem-free light" and she "rejected the need to change" based on psychological testing he administered to her. Dr. Lee explained Erin's test scores revealed she denied any "life problems" or "unfavorable traits" and had a "negative view of helping professionals." Dr. Lee opined Erin had "heightened levels of anger and resentment" and tried to "control events." Her insight was "poor and often

---

[6] The record does not indicate a bonding evaluation was conducted between Erin and Kaine.

A-2259-23

inaccurate," and she was "hyper-focused" on her belief she was "the victim of others' mistreatment."

Dr. Lee testified that Erin's limited knowledge of parenting and "lack of empathy" rendered her unable to address Kaine's needs. Dr. Lee explained why he felt Erin and George were unfit to parent Kaine, why he believed Kaine's safety and protection were at risk of harm if he was left in their care, why the resource parents were capable and bonded caregivers, and why terminating parental rights would not cause more harm than good.

Erin and George did not testify and did not present any witnesses or evidence on their behalf. The Law Guardian did not present any witnesses or evidence. The parties were directed to submit written summations.

On March 7, 2024, the judge placed her decision on the record and entered an order finding in the Division's favor and terminating Erin's and George's parental rights to Kaine. The judge found Dr. Lee's uncontroverted findings were "thorough and comprehensive," and the expert was "very informative and credible." The judge also determined Cocco's uncontroverted testimony to be informative and that she was "very knowledgeable" about the case. In contrast, the judge did not find Dr. Igwe's testimony to be "especially useful." These consolidated appeals followed.

17

II.

The termination of parents' rights to raise their children is a matter of constitutional magnitude. See In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). Those rights, however, are "not absolute" and are limited "by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or . . . be seriously endangered by a neglectful or abusive parent." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 447 (2012).

"Children have their own rights, including the right to a permanent, safe and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). Our courts have acknowledged "the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child." Ibid. Thus, a parent's interest must, at times, yield to the State's obligation to protect children from harm. See N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009).

Consequently, the law requires a balancing of those two competing interests: the parents' constitutionally protected right to raise their children, absent state interference, and the State's responsibility to protect the welfare of

children.  See N.J. Div. of Child Prot. & Permanency v. D.C.A., 256 N.J. 4, 20 (2023).  That balancing "is achieved through the best interest of the child standard."  Ibid. (quoting K.H.O., 161 N.J. at 347).  The Legislature codified that standard in N.J.S.A. 30:4C-15.1(a).  See D.C.A., 256 N.J. at 21 (recognizing the Legislature codified "the best interests test" when it enacted N.J.S.A. 30:4C-15.1(a)).

Thus, when seeking termination of parental rights, the Division must establish, by clear and convincing evidence, the following four-prong criteria set forth in N.J.S.A. 30:4C-15.1(a), as amended by the Legislature in 2021:

> (1)  The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2)  The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3)  The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4)  Termination of parental rights will not do more harm than good.

A-2259-23

These four prongs are "not discrete and separate" but rather "overlap to offer a full picture of the child's best interest." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 554 (2014).

We give substantial deference to the trial court's opportunity to have observed the witnesses first-hand and to evaluate their credibility. Id. at 552. "Our general deference on appeal is also informed by the Family Part judge's 'feel of the case[,]'" N.J. Div. of Child Prot. & Perm. v. D.H., 469 N.J. Super. 107, 116 (App. Div. 2021) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)), and by the Family Part's "special expertise in matters related to the family[.]" F.M., 211 N.J. at 448. Accordingly, we defer to the trial court's factual findings "and uphold those findings if they are grounded in substantial and credible evidence in the record." D.C.A., 256 N.J. at 19.

The trial court's decision should be reversed on appeal only if its findings were "so wholly unsupportable as to result in a denial of justice." N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004); see also N.J. Div. of Child Prot. & Perm. v. D.A., 477 N.J. Super. 63, 80 (App. Div. 2023). We review the trial court's legal conclusions de novo. R.G., 217 N.J. at 552-53; see also D.C.A., 256 N.J. at 19 (acknowledging we give no deference to the trial court's interpretation of N.J.S.A. 30:4C-15.1(a)).

"The first two prongs, N.J.S.A. 30:4C-15.1(a)(1) and (2), are 'the two components of the harm requirement' and 'are related to one another.'" N.J. Div. of Child Prot. & Perm. v. T.D., 454 N.J. Super. 353, 380 (App. Div. 2018) (quoting In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999)). "Therefore, 'evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child.'" Ibid. (quoting D.M.H., 161 N.J. at 379).

Under the first prong, "the Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Dep't of Child. & Fams. v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., 161 N.J. at 352). The Division need not "wait 'until a child is actually irreparably impaired by parental inattention or neglect.'" F.M., 211 N.J. at 449 (quoting D.M.H., 161 N.J. at 383).

Under prong two, "the inquiry centers on whether the parent is able to remove the danger facing the child." Id. at 451 (citing K.H.O., 161 N.J. at 352); see also D.C.A., 256 N.J. at 27 (finding prong two as amended was intended "to ensure that parental fitness – not the child's bond with the resource parents – is the core inquiry when a judge considers the best interests standard's second prong in a termination of parental rights case").

21

Prong three, N.J.S.A. 30:4C-15.1(a)(3), requires the Division to make "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home[,]" and the court to "consider[] alternatives to termination of parental rights." As to the first part of prong three, the reasonableness of the Division's efforts is not conditioned upon their success. N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 488 (App. Div. 2012). The success or failure of the Division's efforts will not "foreclose a finding that the Division met its statutory burden to try to reunify the child with the family." Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. F.H., 389 N.J. Super 576, 620 (App. Div. 2007)).

"Experience tells us that even [the Division's] best efforts may not be sufficient to salvage a parental relationship." F.M., 211 N.J. at 452. As to the second part of the third prong, the Division must prove "by clear and convincing evidence that 'alternatives to termination of parental rights' have been appropriately considered." N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 87 (App. Div. 2013).

Prong four, N.J.S.A. 30:4C-15.1(a)(4), "serves as a fail-safe against termination even where the remaining standards have been met." N.J. Div. of

Youth & Fam. Servs. v. G.L., 191 N.J. 596, 609 (2007). "The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with th[e] parent." E.P., 196 N.J. at 108. In making that determination under the fourth prong, the court may consider evidence regarding the bond between the child and the resource parents. See D.C.A., 256 N.J. at 28 (holding the 2021 amendment to N.J.S.A. 30:4C-15.1(a) "precludes a court from considering the bond between a child and resource parents under the second prong of the best interests standard but does not bar such evidence when the court addresses that standard's fourth prong").

Erin contends the judge erred in concluding termination of her parental rights to Kaine is in his best interest. Erin avers the judge misapplied the applicable law and reached erroneous legal conclusions that do not follow from the evidence presented. Erin also argues that Dr. Lee rendered a net opinion, which should not have been considered by the judge.

George contends: (1) Dr. Lee's IQ tests failed to demonstrate that he and Erin are intellectually disabled and unable to parent; (2) there is a tenuous or ambivalent relationship between him and Kaine because the Division provided inadequate visitation; (3) Kaine was deprived of effective assistance

of counsel because the Law Guardian failed to maintain his visits with him; (4) the judge relied on Kaine's testimony, which fails to distinguish the difference between KLG and adoption; and (5) the judge primarily relied on George's poverty and lack of resources instead of parental dereliction and irresponsibility in her fact-finding.

As detailed in the judge's comprehensive opinion, we agree the record contains adequate substantial, and credible evidence to support the judge's decision to terminate Erin's and George's parental rights. In her extensive opinion, which need not be repeated in detail here, the judge thoroughly addressed all four statutory factors for termination. Both parents have shown themselves under prong one to be unfit to care for Kaine primarily due to the persisting issues of deplorable housing conditions, food insecurity, and domestic violence incidents. The judge emphasized that after four years of litigation, there was still "no specific plan offered to this court" by Erin and George. The judge noted the "tenuous relationship" between Kaine and his parents. The testimony on these issues by the Division's witnesses was unrebutted.

The judge based her prong two finding on Kaine's resource placements spanning over four years. The judge's findings are amply supported by the

opinion testimony of Dr. Lee, who opined that continued delays in Kaine's permanency could cause enduring harm. Moreover, no expert endorsed either parent as an independent caretaker for Kaine. Erin made no significant improvements in the past two years, and neither parent developed any insight regarding why Kaine had to be removed. Kaine tried to speak to Erin about the neglect, but she dissuaded him. The judge's findings as to prong two are amply supported by the record.

As to prong three, the record supports the judge's detailed findings that the Division reasonably provided or offered Erin and George services. The judge highlighted that failure to comply or obtain positive results was attributable only to Erin and George.

Erin contends the judge did not consider significant cultural differences in her analysis and ignored the Legislature's intent to preserve parental rights under the 2021 amendments. George argues the Division created the "tenuous" and "ambivalent" relationship between him and Kaine by providing inadequate visitation, and the judge placed too much emphasis on Kaine's testimony that he wanted to be adopted. We disagree.

The judge had ample basis under prong three to find the Division had adequately explored alternatives to termination. The case workers testified

about the information they had provided to the resource parents about adoption and KLG.  Muriel testified at length about the information provided to her, the differences between KLG and adoption, why she and Martin rejected KLG, and why they wanted to adopt Kaine.

To satisfy the third prong, the record must demonstrate that the Family Part made reasonable efforts to reunite the family and "considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3).  "[A]ssessment of relatives is part of the [Division's] obligation to consult and cooperate with the parent in developing a plan for appropriate services that reinforce the family structure."  N.J. Div. of Youth & Fam. Servs. v. K.L.W., 419 N.J. Super 568, 583 (App. Div. 2011).

"It is the policy of [the Division] to place, whenever possible, children with relatives when those children are removed from the custody of their parents."  N.J. Div. of Youth & Fam. Serv. v. K.F., 353 N.J. Super. 623, 636 (App. Div. 2002).  "That said, although the Division has a statutory duty to evaluate relatives as potential caretakers, there is no presumption favoring the placement of a child with such relatives."  J.S., 433 N.J. Super. at 82.

Under this prong, an alternative to termination of parental rights is KLG.  KLG allows a relative to become the child's legal guardian and commit to care

for the child until adulthood, without stripping parental rights. P.P., 180 N.J. at 508. The Legislature created this arrangement because it found "that an increasing number of children who cannot safely reside with their parents are in the care of a relative or family friend who does not wish to adopt the child or children." N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 222-23 (2010).

Prior to July 2, 2021, KLG was considered "a more permanent option than foster care when adoption '[was] neither feasible nor likely.'" P.P., 180 N.J. at 512 (emphasis added) (quoting N.J.S.A. 3B:12A-6(d)(3) to (4)). As such, "when a caretaker . . . unequivocally assert[ed] a desire to adopt," the standard to impose a KLG was not satisfied because the party seeking a KLG arrangement would not be able to show that adoption was neither feasible nor likely. N.J. Div. of Youth & Fam. Servs. v. T.I., 423 N.J. Super. 127, 130 (App. Div. 2011). In other words, when permanency through adoption was available to a child, KLG could not be used as a defense to the termination of parental rights. N.J. Div. of Youth & Fam. Servs. v. D.H., 398 N.J. Super. 333, 341 (App. Div. 2008).

On July 2, 2021, however, the Legislature enacted L. 2021, c. 154, which, in part, removed the KLG requirement that adoption be "neither feasible nor likely." P.P., 180 N.J. at 512 (emphasis added) (quoting N.J.S.A. 3B:12A-

27

6(d)(3) to (4)). As such, KLG may now remain a valid defense to the termination of parental rights. D.H., 398 N.J. Super. at 341. Regardless of whether the amendment applies retroactively, a KLG defense requires a valid KLG alternative. D.H., 398 N.J. Super. at 341.

Here, the Division established it made reasonable efforts to reunite Erin and George with Kaine, and there were no alternatives to termination of their parental rights through clear and convincing evidence. As the judge found:

> [The Division] provided reasonable efforts in this regard, to include family preservation services, treatment recommendations, psychological evaluations, supervised visitation, therapeutic visitation, individual counseling, family team meetings, assessment of persons for placement, multiple psychological evaluations, a bonding evaluation, as well as comprehensive reunification [—] as well as a comprehensive reunification services program to effectuate the reunification of [Kaine] for the entirety of this matter, even during the respective goal changes.

The judge determined that Erin failed to clean and repair the home, was late or canceled visitations with Kaine on many occasions, and refused individual counseling set up by Cocco because Erin advised her it wasn't needed. Moreover, the judge stressed Erin was discharged unfavorably from parenting classes at St. Francis. When the goal was changed back to

reunification, Erin was referred to the Ocean Reunification Program, but was discharged for non-compliance.

Regarding George, the judge credited Cocco's testimony that he grabbed her arm and tried to force her to sit down. Cocco indicated that during the last six months she was involved with the case, communications broke down between her and George. In the judge's analysis of alternatives to termination of parental rights, she found that KLG was not an appropriate alternative plan in this matter, noting there were no potential relatives or close friends willing to adopt Kaine.

Given Muriel's and Martin's informed decision to reject KLG and choose adoption, we are not persuaded by Erin's and George's argument. "The decision of a resource parent to choose adoption over KLG must be an informed one." N.J. Div of Child Prot. & Perm. v. M.M., 459 N.J. Super. 246, 260 (App. Div. 2019). As the judge reasoned, a resource parent cannot be forced to accept KLG. In sum, there was ample evidence, including expert testimony, to support the judge's findings under prong three.

Lastly, as to the fourth prong, the judge did not abuse her discretion in finding that termination of Erin's and George's parental rights would not do more harm than good. The essence of Erin's argument is that the judge applied

a "better off" analysis and erroneously focused on the resource parents instead of the statutory requirements. Erin claims: (1) no bonding evaluation was performed by any expert with her and Kaine; (2) the judge heavily relied on Dr. Lee's findings and opinions; and (3) the judge relied on Kaine's feelings towards Erin to establish she is unfit to parent him, but discounted her feelings as to terminating her parental rights. George contends that his disrupted attachment with Kaine was due to the Division providing inadequate visitation.

"To satisfy the fourth prong, the State should offer testimony of a well[]qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents." F.M., 211 N.J. at 453 (quoting New Jersey Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281 (2007)). Termination is appropriate, "even in the absence of evidence showing that [the child] has bonded with [the] foster parents," if the court is presented with "a clear and compelling record warranting the termination of parental rights." F.H., 389 N.J. Super. at 623. "The crux of the fourth statutory subpart is the child's need for a permanent and stable home, along with a defined parent-child

relationship." N.J. Div. of Youth and Fam. Servs. H.R., 431 N.J. Super. 212, 226 (App. Div. 2013).

Here, the judge aptly found that the Division has proven that termination of Erin's and George's parental rights will not do more harm than good. The judge noted Dr. Lee's testimony regarding his psychological evaluation of Kaine in her opinion:

> [Kaine] advised that there were other children in the home. He reported the home as good. He recalled being in placement since age ten. He said that he has visits with his dad every week, . . . He does currently not have visits with his birth mother. He indicated to Dr. Lee at that time that he wanted to be adopted by his current resource parents. He said he would miss his dad at that time but not so much his mom. He understood what adoption meant . . . [Kaine] was scared when his parents fought . . . discussed how his mom drank alcohol on occasion. He enjoys school and has friends and likes playing basketball.

Dr. Lee acknowledged that Kaine clearly had a history of instability prior to his removal and that he displayed no remarkable sense of loss at not having a relationship with his parents. Dr. Lee further testified that Kaine "had an ambivalent attachment and relationship with George," which indicated that there is a low risk of this child suffering severe and enduring psychological harm if the relationship with George was terminated.

With regard to Erin, Kaine refused to attend an evaluation with her. The record shows Kaine has not communicated with her for approximately two years, but indicated that although he "loves" her, he is still considering whether or not he wants contact with her in the future. Kaine stated he has very few memories of ever spending time with Erin, and testified she was rarely ever home. And, when Erin was home, she was the aggressor in various acts of domestic violence against George.

The judge also credited the case workers' observations of Kaine and his resource parents and Kaine's testimony on this issue:

> The new place, the resource home, they take care of me and they love me, my grades are good, I stay healthy, and there is food, and the [c]ourt's recollection is that he mentioned that several times, and we have food every night. They keep me safe. There is a mom and a dad and four other children. One is very close to my age, along with another one, and one is [twenty] and one is [twenty-six]. I share a room with one person. I get along with everyone.

Muriel testified that Kaine "fit into the family like a puzzle piece" and his social skills have developed greatly over the past two years. Muriel and Martin are committed to meeting Kaine's needs through adolescence and into adulthood. In contrast, the judge highlighted that George and Erin "have not made any consistent efforts to re-establish parental relationships with [Kaine]

32

or actually plan for his reunification after removal, except for visitation on [George's] part."

The judge did not err in giving substantial weight to Kaine's need for permanency, having been in an uncertain status for four years. M.M., 189 N.J. at 281. The judge's decision was based upon the credible testimony presented, including the testimony of the Division's case workers, Dr. Lee, and Kaine. We are satisfied the judge did not abuse her discretion in finding that termination of Erin's and George's parental rights would not do more harm than good.

To the extent we have not addressed other arguments raised by Erin and George, we find they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2259-23